(Slip Opinion) OCTOBER TERM, 2018 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## FRANCHISE TAX BOARD OF CALIFORNIA *v.* HYATT

### CERTIORARI TO THE SUPREME COURT OF NEVADA

No. 17–1299. Argued January 9, 2019—Decided May 13, 2019

Respondent Hyatt sued petitioner Franchise Tax Board of California (Board) in Nevada state court for alleged torts committed during a tax audit. The Nevada Supreme Court rejected the Board's argument that the Full Faith and Credit Clause required Nevada courts to apply California law and immunize the Board from liability. The court held instead that general principles of comity entitled the Board only to the same immunity that Nevada law afforded Nevada agencies. This Court affirmed, holding that the Full Faith and Credit Clause did not prohibit Nevada from applying its own immunity law. On remand, the Nevada Supreme Court declined to apply a cap on tort liability applicable to Nevada state agencies. This Court reversed, holding that the Full Faith and Credit Clause required Nevada courts to grant the Board the same immunity that Nevada agencies enjoy. The Court was equally divided, however, on whether to overrule *Nevada* v. *Hall*, 440 U. S. 410, which held that the Constitution does not bar suits brought by an individual against a State in the courts of another State. On remand, the Nevada Supreme Court instructed the trial court to enter damages in accordance with Nevada's statutory cap. The Board sought certiorari a third time, raising only the question whether *Nevada* v. *Hall* should be overruled.

*Held*: *Nevada* v. *Hall* is overruled; States retain their sovereign immunity from private suits brought in courts of other States. Pp. 4–18.

(a) The *Hall* majority held that nothing "implicit in the Constitution" requires States to adhere to the sovereign immunity that prevailed at the time of the founding. 440 U. S., at 417–418, 424–427. The Court concluded that the Founders assumed that "prevailing notions of comity would provide adequate protection against the unlikely prospect of an attempt by the courts of one State to assert jurisdiction over another." *Id.*, at 419. The Court's view rested primarily on

the idea that the States maintained sovereign immunity vis-à-vis each other in the same way that foreign nations do.  Pp. 4–5.

(b) *Hall*'s determination misreads the historical record and misapprehends the constitutional design created by the Framers.  Although the Constitution assumes that the States retain their sovereign immunity except as otherwise provided, it also fundamentally adjusts the States' relationship with each other and curtails the States' ability, as sovereigns, to decline to recognize each other's immunity in their own courts.  Pp. 5–16.

(1) At the time of the founding, it was well settled that States were immune from suit both under the common law and under the law of nations.  The States retained these aspects of sovereignty, "except as altered by the plan of the Convention or certain constitutional Amendments." *Alden* v. *Maine*, 527 U. S. 706, 713.  Pp. 6–9.

(2) Article III abrogated certain aspects of the States' traditional immunity by providing a neutral federal forum in which the States agreed to be amenable to suits brought by other States.  And in ratifying the Constitution, the States similarly surrendered a portion of their immunity by consenting to suits brought against them by the United States in federal courts.  When this Court held in *Chisholm* v. *Georgia*, 2 Dall. 419, that Article III extended the federal judicial power over controversies between a State and citizens of another State, Congress and the States acted swiftly to draft and ratify the Eleventh Amendment, which confirms that the Constitution was not meant to "rais[e] up" any suits against the States that were "anomalous and unheard of when the Constitution was adopted," *Hans* v. *Louisiana*, 134 U. S. 1, 18.   The "natural inference" from the Amendment's speedy adoption is that "the Constitution was understood, in light of its history and structure, to preserve the States' traditional immunity from private suits." *Alden, supra*, at 723–724.  This view of the States' sovereign immunity accorded with the understanding of the Constitution by its leading advocates, including Hamilton, Madison, and Marshall, when it was ratified.  Pp. 9–12.

(3)  State sovereign immunity in another State's courts is integral to the structure of the Constitution.  The problem with Hyatt's argument—that interstate sovereign immunity exists only as a matter of comity and can be disregarded by the forum State—is that the Constitution affirmatively altered the relationships between the States so that they no longer relate to each other as true foreign sovereigns.  Numerous provisions reflect this reality.  Article I divests the States of the traditional diplomatic and military tools that foreign sovereigns possess.  And Article IV imposes duties on the States not required by international law.  The Constitution also reflects alterations to the States' relationships with each other, confirming that

Syllabus

they are no longer fully independent nations free to disregard each other's sovereignty. See *New Hampshire* v. *Louisiana*, 108 U. S. 76, 90. Hyatt's argument is precisely the type of "ahistorical literalism" this Court has rejected when "interpreting the scope of the States' sovereign immunity since the discredited decision in *Chisholm*." *Alden, supra*, at 730. Moreover, his argument proves too much. Many constitutional doctrines not spelled out in the Constitution are nevertheless implicit in its structure and supported by historical practice, *e.g.*, judicial review, *Marbury* v. *Madison*, 1 Cranch 137, 176–180. Pp. 12–16.

(c) *Stare decisis* is "'not an inexorable command,'" *Pearson* v. *Callahan*, 555 U. S. 223, 233, and is "at its weakest" when interpreting the Constitution, *Agostini* v. *Felton*, 521 U. S. 203, 235. The Court's precedents identify, as relevant here, four factors to consider: the quality of the decision's reasoning, its consistency with related decisions, legal developments since the decision, and reliance on the decision. See *Janus* v. *State, County, and Municipal Employees*, 585 U. S. \_\_\_, \_\_\_–\_\_\_. The first three factors support overruling *Hall*. As to the fourth, case-specific reliance interests are not sufficient to persuade this Court to adhere to an incorrect resolution of an important constitutional question. Pp. 16–17.

133 Nev. \_\_\_, 407 P. 3d 717, reversed and remanded.

THOMAS, J., delivered the opinion of the Court, in which ROBERTS, C. J., and ALITO, GORSUCH, and KAVANAUGH, JJ., joined. BREYER, J., filed a dissenting opinion, in which GINSBURG, SOTOMAYOR, and KAGAN, JJ., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 17–1299

## FRANCHISE TAX BOARD OF CALIFORNIA, PETITIONER *v.* GILBERT P. HYATT

### ON WRIT OF CERTIORARI TO THE SUPREME COURT OF NEVADA

[May 13, 2019]

JUSTICE THOMAS delivered the opinion of the Court.

This case, now before us for the third time, requires us to decide whether the Constitution permits a State to be sued by a private party without its consent in the courts of a different State. We hold that it does not and overrule our decision to the contrary in *Nevada* v. *Hall*, 440 U. S. 410 (1979).

I

In the early 1990s, respondent Gilbert Hyatt earned substantial income from a technology patent for a computer formed on a single integrated circuit chip. Although Hyatt's claim was later canceled, see *Hyatt* v. *Boone*, 146 F. 3d 1348 (CA Fed. 1998), his royalties in the interim totaled millions of dollars. Prior to receiving the patent, Hyatt had been a long-time resident of California. But in 1991, Hyatt sold his house in California and rented an apartment, registered to vote, obtained insurance, opened a bank account, and acquired a driver's license in Nevada. When he filed his 1991 and 1992 tax returns, he claimed Nevada—which collects no personal income tax, see Nev. Const., Art. 10, §1(9)—as his primary place of residence.

Petitioner Franchise Tax Board of California (Board), the state agency responsible for assessing personal income tax, suspected that Hyatt's move was a sham. Thus, in 1993, the Board launched an audit to determine whether Hyatt underpaid his 1991 and 1992 state income taxes by misrepresenting his residency. In the course of the audit, employees of the Board traveled to Nevada to conduct interviews with Hyatt's estranged family members and shared his personal information with business contacts. In total, the Board sent more than 100 letters and demands for information to third parties. The Board ultimately concluded that Hyatt had not moved to Nevada until April 1992 and owed California more than $10 million in back taxes, interest, and penalties. Hyatt protested the audit before the Board, which upheld the audit after an 11-year administrative proceeding. The appeal of that decision remains pending before the California Office of Tax Appeals.

In 1998, Hyatt sued the Board in Nevada state court for torts he alleged the agency committed during the audit. After the trial court denied in part the Board's motion for summary judgment, the Board petitioned the Nevada Supreme Court for a writ of mandamus ordering dismissal on the ground that the State of California was immune from suit. The Board argued that, under the Full Faith and Credit Clause, Nevada courts must apply California's statute immunizing the Board from liability for all injuries caused by its tax collection. See U. S. Const., Art. IV, §1; Cal. Govt. Code Ann. §860.2 (West 1995). The Nevada Supreme Court rejected that argument and held that, under general principles of comity, the Board was entitled to the same immunity that Nevada law afforded Nevada agencies—that is, immunity for negligent but not intentional torts. We granted certiorari and unanimously affirmed, holding that the Full Faith and Credit Clause did not prohibit Nevada from applying its own immunity

law to the case. *Franchise Tax Bd. of Cal.* v. *Hyatt*, 538 U. S. 488, 498–499 (2003) (*Hyatt I*). Because the Board did not ask us to overrule *Nevada* v. *Hall, supra*, we did not revisit that decision. *Hyatt I, supra,* at 497.

On remand, the trial court conducted a 4-month jury trial that culminated in a verdict for Hyatt that, with prejudgment interest and costs, exceeded $490 million. On appeal, the Nevada Supreme Court rejected most of the damages awarded by the lower court, upholding only a $1 million judgment on one of Hyatt's claims and remanding for a new damages trial on another. Although the court recognized that tort liability for Nevada state agencies was capped at $50,000 under state law, it nonetheless held that Nevada public policy precluded it from applying that limitation to the California agency in this case. We again granted certiorari and this time reversed, holding that the Full Faith and Credit Clause required Nevada courts to grant the Board the same immunity that Nevada agencies enjoy. *Franchise Tax Bd. of Cal.* v. *Hyatt,* 578 U. S. \_\_\_, \_\_\_–\_\_\_ (2016) (slip op., at 4–9) (*Hyatt II*). Although the question was briefed and argued, the Court was equally divided on whether to overrule *Hall* and thus affirmed the jurisdiction of the Nevada Supreme Court. *Hyatt II, supra,* at \_\_\_ (slip op., at 1). On remand, the Nevada Supreme Court instructed the trial court to enter damages in accordance with the statutory cap for Nevada agencies. 133 Nev. \_\_\_, 407 P. 3d 717 (2017).

We granted, for a third time, the Board's petition for certiorari, 585 U. S. \_\_\_ (2018). The sole question presented is whether *Nevada* v. *Hall* should be overruled.[1]

---

[1] Hyatt argues that the law-of-the-case doctrine precludes our review of this question, but he failed to raise that nonjurisdictional issue in his brief in opposition. We therefore deem this argument waived. See this Court's Rule 15.2; *Arizona* v. *California*, 460 U. S. 605, 618 (1983) ("Law of the case directs a court's discretion, it does not limit the tribunal's power"). We also reject Hyatt's argument that the Board

## II

*Nevada* v. *Hall* is contrary to our constitutional design and the understanding of sovereign immunity shared by the States that ratified the Constitution. *Stare decisis* does not compel continued adherence to this erroneous precedent. We therefore overrule *Hall* and hold that States retain their sovereign immunity from private suits brought in the courts of other States.

## A

*Hall* held that the Constitution does not bar private suits against a State in the courts of another State. 440 U. S., at 416–421. The opinion conceded that States were immune from such actions at the time of the founding, but it nonetheless concluded that nothing "implicit in the Constitution" requires States "to adhere to the sovereign-immunity doctrine as it prevailed when the Constitution was adopted." *Id.,* at 417–418, 424–427. Instead, the Court concluded that the Founders assumed that "prevailing notions of comity would provide adequate protection against the unlikely prospect of an attempt by the courts of one State to assert jurisdiction over another." *Id.,* at 419. The Court's view rested primarily on the idea that the States maintained sovereign immunity vis-à-vis each other in the same way that foreign nations do, meaning that immunity is available only if the forum State "voluntar[ily]" decides "to respect the dignity of the [defendant State] as a matter of comity." *Id.,* at 416; see also *id.,* at 424–427.

The *Hall* majority was unpersuaded that the Constitution implicitly altered the relationship between the States. In the Court's view, the ratification debates, the Eleventh

---

waived its immunity. The Board has raised an immunity-based argument from this suit's inception, though it was initially based on the Full Faith and Credit Clause.

Amendment, and our sovereign-immunity precedents did not bear on the question because they "concerned questions of federal-court jurisdiction." *Id.*, at 420. The Court also found unpersuasive the fact that the Constitution delineates several limitations on States' authority, such as Article I powers granted exclusively to Congress and Article IV requirements imposed on States. *Id.,* at 425. Despite acknowledging "that ours is not a union of 50 wholly independent sovereigns," *Hall* inferred from the lack of an express sovereign immunity granted to the States and from the Tenth Amendment that the States retained the power in their own courts to deny immunity to other States. *Ibid.*

Chief Justice Burger, Justice Blackmun, and Justice Rehnquist dissented.

## B

*Hall*'s determination that the Constitution does not contemplate sovereign immunity for each State in a sister State's courts misreads the historical record and misapprehends the "implicit ordering of relationships within the federal system necessary to make the Constitution a workable governing charter and to give each provision within that document the full effect intended by the Framers." *Id.*, at 433 (Rehnquist, J., dissenting). As Chief Justice Marshall explained, the Founders did not state every postulate on which they formed our Republic—"we must never forget, that it is *a constitution* we are expounding." *McCulloch* v. *Maryland*, 4 Wheat. 316, 407 (1819). And although the Constitution assumes that the States retain their sovereign immunity except as otherwise provided, it also fundamentally adjusts the States' relationship with each other and curtails their ability, as sovereigns, to decline to recognize each other's immunity.

1

After independence, the States considered themselves fully sovereign nations. As the Colonies proclaimed in 1776, they were "Free and Independent States" with "full Power to levy War, conclude Peace, contract Alliances, establish Commerce, and to do all other Acts and Things which Independent States may of right do." Declaration of Independence ¶4. Under international law, then, independence "entitled" the Colonies "to all the rights and powers of sovereign states." *McIlvaine* v. *Coxe's Lessee*, 4 Cranch 209, 212 (1808).

"An integral component" of the States' sovereignty was "their immunity from private suits." *Federal Maritime Comm'n* v. *South Carolina Ports Authority*, 535 U. S. 743, 751–752 (2002); see *Alden* v. *Maine*, 527 U. S. 706, 713 (1999) ("[A]s the Constitution's structure, its history, and the authoritative interpretations by this Court make clear, the States' immunity from suit is a fundamental aspect of the sovereignty which the States enjoyed before the ratification of the Constitution, and which they retain today . . . "). This fundamental aspect of the States' "inviolable sovereignty" was well established and widely accepted at the founding. The Federalist No. 39, p. 245 (C. Rossiter ed. 1961) (J. Madison); see *Alden*, *supra*, at 715–716 ("[T]he doctrine that a sovereign could not be sued without its consent was universal in the States when the Constitution was drafted and ratified"). As Alexander Hamilton explained:

> "It is inherent in the nature of sovereignty not to be amenable to the suit of an individual without its consent. This is the general sense and the general practice of mankind; and the exemption, as one of the attributes of sovereignty, is now enjoyed by the government of every State in the Union." The Federalist No. 81, at 487 (emphasis deleted).

The Founders believed that both "common law sovereign immunity" and "law-of-nations sovereign immunity" prevented States from being amenable to process in any court without their consent. See Pfander, Rethinking the Supreme Court's Original Jurisdiction in State-Party Cases, 82 Cal. L. Rev. 555, 581–588 (1994); see also Nelson, Sovereign Immunity as a Doctrine of Personal Jurisdiction, 115 Harv. L. Rev. 1559, 1574–1579 (2002). The common-law rule was that "no suit or action can be brought against the king, even in civil matters, because no court can have jurisdiction over him." 1 W. Blackstone, Commentaries on the Laws of England 235 (1765) (Blackstone). The law-of-nations rule followed from the "perfect equality and absolute independence of sovereigns" under that body of international law. *Schooner Exchange* v. *McFaddon*, 7 Cranch 116, 137 (1812); see C. Phillipson, Wheaton's Elements of International Law 261 (5th ed. 1916) (recognizing that sovereigns "enjoy equality before international law"); 1 J. Kent, Commentaries on American Law 20 (G. Comstock ed. 1867). According to the founding era's foremost expert on the law of nations, "[i]t does not . . . belong to any foreign power to take cognisance of the administration of [another] sovereign, to set himself up for a judge of his conduct, and to oblige him to alter it." 2 E. de Vattel, The Law of Nations §55, p. 155 (J. Chitty ed. 1883). The sovereign is "exemp[t] . . . from all [foreign] jurisdiction." 4 *id.*, §108, at 486.

The founding generation thus took as given that States could not be haled involuntarily before each other's courts. See Woolhandler, Interstate Sovereign Immunity, 2006 S. Ct. Rev. 249, 254–259. This understanding is perhaps best illustrated by preratification examples. In 1781, a creditor named Simon Nathan tried to recover a debt that Virginia allegedly owed him by attaching some of its property in Philadelphia. James Madison and other Virginia delegates to the Confederation Congress responded by

sending a communique to Pennsylvania requesting that its executive branch have the action dismissed. See Letter from Virginia Delegates to Supreme Executive Council of Pennsylvania (July 9, 1781), in 3 The Papers of James Madison, 184–185 (W. Hutchinson & W. Rachal eds. 1963). As Madison framed it, the Commonwealth's property could not be attached by process issuing from a court of "any other State in the Union." *Id.,* at 184. To permit otherwise would require Virginia to "abandon its Sovereignty by descending to answer before the Tribunal of another Power." *Ibid.* Pennsylvania Attorney General William Bradford intervened, urging the Court of Common Pleas to dismiss the action. See *Nathan* v. *Virginia*, 1 Dall. 77, 78 (C. P. Phila. Cty. 1781). According to Bradford, the suit violated international law because "all sovereigns are in a state of equality and independence, exempt from each other's jurisdiction." *Ibid.* "[A]ll jurisdiction implies superiority over the party," Bradford argued, "but there could be no superiority" between the States, and thus no jurisdiction, because the States were "perfect[ly] equa[l]" and "entire[ly] independen[t]." *Ibid.* The court agreed and refused to grant Nathan the writ of attachment. *Id.,* at 80.

Similarly, a Pennsylvania Admiralty Court that very same year dismissed a libel action against a South Carolina warship, brought by its crew to recover unpaid wages. The court reasoned that the vessel was owned by a "sovereign independent state." *Moitez* v. *The South Carolina*, 17 F. Cas. 574 (No. 9697) (1781).

The Founders were well aware of the international-law immunity principles behind these cases. Federalists and Antifederalists alike agreed in their preratification debates that States could not be sued in the courts of other States. One Federalist, who argued that Article III would waive the States' immunity in federal court, admitted that the waiver was desirable because of the "impossibility of

calling a sovereign state before the jurisdiction of another sovereign state." 3 Debates on the Constitution 549 (J. Elliot ed. 1876) (Pendleton) (Elliot's Debates). Two of the most prominent Antifederalists—Federal Farmer and Brutus—disagreed with the Federalists about the desirability of a federal forum in which States could be sued, but did so for the very reason that the States had previously been "subject to no such actions" in any court and were not "oblige[d]" "to answer to an individual in a court of law." Federal Farmer No. 3 (Oct. 10, 1787), in 4 The Founders' Constitution 227 (P. Kurland & R. Lerner eds. 1987). They found it "humiliating and degrading" that a State might have to answer "the suit of an individual." Brutus No. 13 (Feb. 21, 1788), in *id.,* at 238.

In short, at the time of the founding, it was well settled that States were immune under both the common law and the law of nations. The Constitution's use of the term "States" reflects both of these kinds of traditional immunity. And the States retained these aspects of sovereignty, "except as altered by the plan of the Convention or certain constitutional Amendments." *Alden*, 527 U. S., at 713.

2

One constitutional provision that abrogated certain aspects of this traditional immunity was Article III, which provided a neutral federal forum in which the States agreed to be amenable to suits brought by other States. Art. III, §2; see *Alden, supra,* at 755. "The establishment of a permanent tribunal with adequate authority to determine controversies between the States, in place of an inadequate scheme of arbitration, was essential to the peace of the Union." *Principality of Monaco* v. *Mississippi*, 292 U. S. 313, 328 (1934). As James Madison explained during the Convention debates, "there can be no impropriety in referring such disputes" between coequal sovereigns to a superior tribunal. Elliot's Debates 532.

The States, in ratifying the Constitution, similarly surrendered a portion of their immunity by consenting to suits brought against them by the United States in federal courts. See *Monaco*, *supra,* at 328; *Federal Maritime Comm'n*, 535 U. S., at 752. "While that jurisdiction is not conferred by the Constitution in express words, it is inherent in the constitutional plan." *Monaco*, *supra*, at 329. Given that "all jurisdiction implies superiority of power," Blackstone 235, the only forums in which the States have consented to suits by one another and by the Federal Government are Article III courts. See *Federal Maritime Comm'n*, *supra*, at 752.

The Antifederalists worried that Article III went even further by extending the federal judicial power over controversies "between a State and Citizens of another State." They suggested that this provision implicitly waived the States' sovereign immunity against *private* suits in federal courts. But "[t]he leading advocates of the Constitution assured the people in no uncertain terms" that this reading was incorrect. *Alden*, 527 U. S., at 716; see *id.,* at 716–718 (citing arguments by Hamilton, Madison, and John Marshall). According to Madison:

> "[A federal court's] jurisdiction in controversies between a state and citizens of another state is much objected to, and perhaps without reason. It is not in the power of individuals to call any state into court. The only operation it can have, is that, if a state should wish to bring a suit against a citizen, it must be brought before the federal court. This will give satisfaction to individuals, as it will prevent citizens, on whom a state may have a claim, being dissatisfied with the state courts." Elliot's Debates 533.

John Marshall echoed these sentiments:

> "With respect to disputes between *a state and the citizens of another state*, its jurisdiction has been decried

with unusual vehemence.  I hope no gentleman will
think that a state will be called at the bar of the fed-
eral court. . . . The intent is, to enable states to re-
cover claims of individuals residing in other states.  I
contend this construction is warranted by the words.”
*Id.,* at 555 (emphasis in original).

Not long after the founding, however, the Antifederal-
ists’ fears were realized.  In *Chisholm* v. *Georgia*, 2 Dall.
419 (1793), the Court held that Article III allowed the very
suits that the “Madison-Marshall-Hamilton triumvirate”
insisted it did not.  *Hall*, 440 U. S., at 437 (Rehnquist, J.,
dissenting).  That decision precipitated an immediate
“furor” and “uproar” across the country.  1 J. Goebel,
Antecedents and Beginnings to 1801, History of the Su-
preme Court of the United States 734, 737 (1971); see *id.,*
at 734–741.  Congress and the States accordingly acted
swiftly to remedy the Court’s blunder by drafting and
ratifying the Eleventh Amendment.[2]  See *Edelman* v.
*Jordan*, 415 U. S. 651, 660–662 (1974); see also *Federal
Maritime Comm’n*, *supra*, at 753 (acknowledging that
*Chisholm* was incorrect); *Alden*, *supra*, at 721–722 (same).

The Eleventh Amendment confirmed that the Constitu-
tion was not meant to “rais[e] up” any suits against the
States that were “anomalous and unheard of when the
Constitution was adopted.”  *Hans* v. *Louisiana*, 134 U. S.
1, 18 (1890).  Although the terms of that Amendment
address only “the specific provisions of the Constitution
that had raised concerns during the ratification debates
and formed the basis of the *Chisholm* decision,” the “natu-
ral inference” from its speedy adoption is that “the Consti-

—————

[2] The Eleventh Amendment provides: “The Judicial power of the
United States shall not be construed to extend to any suit in law or
equity, commenced or prosecuted against one of the United States by
Citizens of another State, or by Citizens or Subjects of any Foreign
State.”

tution was understood, in light of its history and structure, to preserve the States' traditional immunity from private suits." *Alden*, *supra*, at 723–724. We have often emphasized that "[t]he Amendment is rooted in a recognition that the States, although a union, maintain certain attributes of sovereignty, including sovereign immunity." *Puerto Rico Aqueduct and Sewer Authority* v. *Metcalf & Eddy, Inc.*, 506 U. S. 139, 146 (1993). In proposing the Amendment, "Congress acted not to change but to restore the original constitutional design." *Alden*, 527 U. S., at 722. The "sovereign immunity of the States," we have said, "neither derives from, nor is limited by, the terms of the Eleventh Amendment." *Id.,* at 713.

Consistent with this understanding of state sovereign immunity, this Court has held that the Constitution bars suits against nonconsenting States in a wide range of cases. See, *e.g., Federal Maritime Comm'n*, *supra* (actions by private parties before federal administrative agencies); *Alden*, *supra* (suits by private parties against a State in its own courts); *Blatchford* v. *Native Village of Noatak,* 501 U. S. 775 (1991) (suits by Indian tribes in federal court); *Monaco*, 292 U. S. 313 (suits by foreign states in federal court); *Ex parte New York*, 256 U. S. 490 (1921) (admiralty suits by private parties in federal court); *Smith* v. *Reeves*, 178 U. S. 436 (1900) (suits by federal corporations in federal court).

3

Despite this historical evidence that interstate sovereign immunity is preserved in the constitutional design, Hyatt insists that such immunity exists only as a "matter of comity" and can be disregarded by the forum State. *Hall*, *supra,* at 416. He reasons that, before the Constitution was ratified, the States had the power of fully independent nations to deny immunity to fellow sovereigns; thus, the States must retain that power today with respect to each

other because "nothing in the Constitution or formation of the Union altered that balance among the still-sovereign states." Brief for Respondent 14. Like the majority in *Hall*, he relies primarily on our early foreign immunity decisions. For instance, he cites *Schooner Exchange* v. *McFaddon*, in which the Court dismissed a libel action against a French warship docked in Philadelphia because, under the law of nations, a sovereign's warships entering the ports of a friendly nation are exempt from the jurisdiction of its courts. 7 *Cranch*, at 145–146. But whether the host nation respects that sovereign immunity, Chief Justice Marshall noted, is for the host nation to decide, for "[t]he jurisdiction of [a] nation within its own territory is necessarily exclusive and absolute" and "is susceptible of no limitation not imposed by itself." *Id.,* at 136. Similar reasoning is found in *The Santissima Trinidad*, 7 Wheat. 283, 353 (1822), where Justice Story noted that the host nation's consent to provide immunity "may be withdrawn upon notice at any time, without just offence."

The problem with Hyatt's argument is that the Constitution affirmatively altered the relationships between the States, so that they no longer relate to each other solely as foreign sovereigns. Each State's equal dignity and sovereignty under the Constitution implies certain constitutional "limitation[s] on the sovereignty of all of its sister States." *World-Wide Volkswagen Corp.* v. *Woodson*, 444 U. S. 286, 293 (1980). One such limitation is the inability of one State to hale another into its courts without the latter's consent. The Constitution does not merely allow States to afford each other immunity as a matter of comity; it embeds interstate sovereign immunity within the constitutional design. Numerous provisions reflect this reality.

To begin, Article I divests the States of the traditional diplomatic and military tools that foreign sovereigns possess. Specifically, the States can no longer prevent or

remedy departures from customary international law
because the Constitution deprives them of the independ-
ent power to lay imposts or duties on imports and exports,
to enter into treaties or compacts, and to wage war. Com-
pare Art. I, §10, with Declaration of Independence ¶4
(asserting the power to "levy War, conclude Peace, con-
tract Alliances, [and] establish Commerce"); see *Kansas* v.
*Colorado*, 185 U. S. 125, 143 (1902).

Article IV also imposes duties on the States not required
by international law. The Court's Full Faith and Credit
Clause precedents, for example, demand that state-court
judgments be accorded full effect in other States and
preclude States from "adopt[ing] any policy of hostility to
the public Acts" of other States. *Hyatt II*, 578 U. S*.,* at ___
(slip op., at 5) (internal quotation marks omitted); see
Art. IV, §1. States must also afford citizens of each State
"all Privileges and Immunities of Citizens in the several
States" and honor extradition requests upon "Demand of
the executive Authority of the State" from which the fugi-
tive fled. Art. IV, §2. Foreign sovereigns cannot demand
these kinds of reciprocal responsibilities absent consent or
compact. But the Constitution imposes them as part of its
transformation of the States from a loose league of friend-
ship into a perpetual Union based on the "fundamental
principle of *equal* sovereignty among the States." *Shelby
County* v. *Holder*, 570 U. S. 529, 544 (2013) (emphasis in
original and internal quotation marks omitted).

The Constitution also reflects implicit alterations to the
States' relationships with each other, confirming that they
are no longer fully independent nations. See *New Hamp-
shire* v. *Louisiana*, 108 U. S. 76, 90 (1883). For example,
States may not supply rules of decision governing "dis-
putes implicating the[ir] conflicting rights." *Texas Indus-
tries, Inc.* v. *Radcliff Materials, Inc.*, 451 U. S. 630, 641
(1981). Thus, no State can apply its own law to interstate
disputes over borders, *Cissna* v. *Tennessee*, 246 U. S. 289,

295 (1918), water rights, *Hinderlider* v. *La Plata River & Cherry Creek Ditch Co.*, 304 U. S. 92, 110 (1938), or the interpretation of interstate compacts, *Petty* v. *Tennessee-Missouri Bridge Comm'n*, 359 U. S. 275, 278–279 (1959). The States would have had the raw power to apply their own law to such matters before they entered the Union, but the Constitution implicitly forbids that exercise of power because the "interstate . . . nature of the controversy makes it inappropriate for state law to control." *Texas Industries*, *supra*, at 641. Some subjects that were decided by pure "political power" before ratification now turn on federal "rules of law." *Rhode Island* v. *Massachusetts*, 12 Pet. 657, 737 (1838). See Clark, Federal Common Law: A Structural Reinterpretation, 144 U. Pa. L. Rev. 1245, 1322–1331 (1996).

Interstate sovereign immunity is similarly integral to the structure of the Constitution. Like a dispute over borders or water rights, a State's assertion of compulsory judicial process over another State involves a direct conflict between sovereigns. The Constitution implicitly strips States of any power they once had to refuse each other sovereign immunity, just as it denies them the power to resolve border disputes by political means. Interstate immunity, in other words, is "implied as an essential component of federalism." *Hall*, 440 U. S., at 430–431 (Blackmun, J., dissenting).

Hyatt argues that we should find no right to sovereign immunity in another State's courts because no constitutional provision explicitly grants that immunity. But this is precisely the type of "ahistorical literalism" that we have rejected when "interpreting the scope of the States' sovereign immunity since the discredited decision in *Chisholm*." *Alden*, 527 U. S., at 730; see *id.,* at 736 ("[T]he bare text of the Amendment is not an exhaustive description of the States' constitutional immunity from suit"). In light of our constitutional structure, the historical under-

standing of state immunity, and the swift enactment of
the Eleventh Amendment after the Court departed from
this understanding in *Chisholm*, "[i]t is not rational to
suppose that the sovereign power should be dragged be-
fore a court."  Elliot's Debates 555 (Marshall).  Indeed, the
spirited historical debate over Article III courts and the
immediate reaction to *Chisholm* make little sense if the
Eleventh Amendment were the only source of sovereign
immunity and private suits against the States could al-
ready be brought in "partial, local tribunals."   Elliot's
Debates 532 (Madison).  Nor would the Founders have
objected so strenuously to a neutral federal forum for
private suits against States if they were open to a State
being sued in a different State's courts.  Hyatt's view thus
inverts the Founders' concerns about state-court parochi-
alism.  *Hall*, *supra*, at 439 (Rehnquist, J., dissenting).

Moreover, Hyatt's ahistorical literalism proves too
much.  There are many other constitutional doctrines that
are not spelled out in the Constitution but are neverthe-
less implicit in its structure and supported by historical
practice—including, for example, judicial review, *Marbury*
v. *Madison*, 1 Cranch 137, 176–180 (1803); intergovern-
mental tax immunity, *McCulloch*, 4 Wheat., at 435–436;
executive privilege, *United States* v. *Nixon*, 418 U. S. 683,
705–706 (1974); executive immunity, *Nixon* v. *Fitzgerald*,
457 U. S. 731, 755–758 (1982); and the President's re-
moval power, *Myers* v. *United States*, 272 U. S. 52, 163–164
(1926).  Like these doctrines, the States' sovereign immun-
ity is a historically rooted principle embedded in the text
and structure of the Constitution.

C

With the historical record and precedent against him,
Hyatt defends *Hall* on the basis of *stare decisis*.  But *stare
decisis* is "'not an inexorable command,'" *Pearson* v. *Cal-
lahan*, 555 U. S. 223, 233 (2009), and we have held that it

is "at its weakest when we interpret the Constitution because our interpretation can be altered only by constitutional amendment," *Agostini* v. *Felton*, 521 U. S. 203, 235 (1997). The Court's precedents identify a number of factors to consider, four of which warrant mention here: the quality of the decision's reasoning; its consistency with related decisions; legal developments since the decision; and reliance on the decision. See *Janus* v. *State, County, and Municipal Employees*, 585 U. S. \_\_\_, \_\_\_–\_\_\_ (2018) (slip op., at 34–35); *United States* v. *Gaudin*, 515 U. S. 506, 521 (1995).

The first three factors support our decision to overrule *Hall*. We have already explained that *Hall* failed to account for the historical understanding of state sovereign immunity and that it failed to consider how the deprivation of traditional diplomatic tools reordered the States' relationships with one another. We have also demonstrated that *Hall* stands as an outlier in our sovereign-immunity jurisprudence, particularly when compared to more recent decisions.

As to the fourth factor, we acknowledge that some plaintiffs, such as Hyatt, have relied on *Hall* by suing sovereign States. Because of our decision to overrule *Hall*, Hyatt unfortunately will suffer the loss of two decades of litigation expenses and a final judgment against the Board for its egregious conduct. But in virtually every case that overrules a controlling precedent, the party relying on that precedent will incur the loss of litigation expenses and a favorable decision below. Those case-specific costs are not among the reliance interests that would persuade us to adhere to an incorrect resolution of an important constitutional question.

\*    \*    \*

*Nevada* v. *Hall* is irreconcilable with our constitutional structure and with the historical evidence showing a

widespread preratification understanding that States retained immunity from private suits, both in their own courts and in other courts. We therefore overrule that decision. Because the Board is thus immune from Hyatt's suit in Nevada's courts, the judgment of the Nevada Supreme Court is reversed, and the case is remanded for proceedings not inconsistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

_____

No. 17–1299

_____

## FRANCHISE TAX BOARD OF CALIFORNIA, PETITIONER *v.* GILBERT P. HYATT

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF
NEVADA

[May 13, 2019]

JUSTICE BREYER, with whom JUSTICE GINSBURG, JUSTICE SOTOMAYOR, and JUSTICE KAGAN join, dissenting.

Can a private citizen sue one State in the courts of another? Normally the answer to this question is no, because the State where the suit is brought will choose to grant its sister States immunity. But the question here is whether the Federal Constitution *requires* each State to grant its sister States immunity, or whether the Constitution instead *permits* a State to grant or deny its sister States immunity as it chooses.

We answered that question 40 years ago in *Nevada* v. *Hall,* 440 U. S. 410 (1979). The Court in *Hall* held that the Constitution took the permissive approach, leaving it up to each State to decide whether to grant or deny its sister States sovereign immunity. Today, the majority takes the contrary approach—the absolute approach—and overrules *Hall.* I can find no good reason to overrule *Hall,* however, and I consequently dissent.

I

*Hall* involved a suit brought by a California resident against the State of Nevada in the California courts. We rejected the claim that the Constitution entitled Nevada to absolute immunity. We first considered the immunity that States possessed as independent sovereigns before

the Constitution was ratified.  And we then asked whether
ratification of the Constitution altered the principles of
state sovereign immunity in any relevant respect.  At both
steps, we concluded, the relevant history and precedent
refuted the claim that States are entitled to absolute
immunity in each other's courts.

### A

*Hall* first considered the immunity that States pos-
sessed before ratification.  "States considered themselves
fully sovereign nations" during this period, *ante*, at 6, and
the Court in *Hall* therefore asked whether sovereign
nations would have enjoyed absolute immunity in each
other's courts at the time of our founding.

The answer was no.  At the time of the founding, nations
granted other nations sovereign immunity in their courts
not as a matter of legal obligation but as a matter of
choice, *i.e.*, of comity or grace or consent.  Foreign sover-
eign immunity was a doctrine "of implied consent by the
territorial sovereign . . . deriving from standards of public
morality, fair dealing, reciprocal self-interest, and re-
spect."  *National City Bank of N. Y.* v. *Republic of China*,
348 U. S. 356, 362 (1955).  Since customary international
law made the matter one of choice, a nation could with-
draw that sovereign immunity if it so chose.

This Court took that view of foreign sovereign immunity
in two founding-era decisions that forecast the result in
*Hall*.  In *Schooner Exchange* v. *McFaddon*, 7 Cranch 116
(1812), when considering whether an American citizen
could impose a lien upon a French warship, Chief Justice
John Marshall wrote for the Court that international law
did not *require* the United States to grant France sover-
eign immunity.  Any such requirement, he reasoned,
"would imply a diminution" of American "sovereignty."
*Id.*, at 136.  Instead, Chief Justice Marshall observed that
any "exceptions" to "the full and complete power of a na-

tion within its own territories, must be traced up to *the consent of the nation itself*" and "can flow from no other legitimate source." *Ibid.* (emphasis added).

The Court ultimately held in *Schooner Exchange* that the United States had consented implicitly to give immunity to the French warship. See *id.*, at 147. But that was because "national ships of war, entering the port of a friendly power open for their reception, [we]re to be considered as exempted by the consent of that power from its jurisdiction." *Id.,* at 145–146. And the Chief Justice was careful to note that this implication of consent could be "destroy[ed]" in various ways, including by subjecting the foreign nation "to the ordinary tribunals." *Id.,* at 146.

Ten years later, in *The Santissima Trinidad*, 7 Wheat. 283 (1822), this Court unanimously reaffirmed *Schooner Exchange*'s conclusion that foreign sovereign immunity was not an absolute right. The Court in *Santissima Trinidad* was called upon to determine whether the cargo of an Argentine ship, found in Baltimore Harbor, was immune from seizure. The ship's commander asserted that Argentina had an absolute right to immunity from suit, claiming that "no sovereign is answerable for his acts to the tribunals of any foreign sovereign." *Id.*, at 352. But Justice Joseph Story, writing for the Court, squarely rejected the "notion that a foreign sovereign had an absolute right, in virtue of his sovereignty, to an exemption of his property from the local jurisdiction of another sovereign, when it came within his territory." *Ibid.* Rather, any exception to jurisdiction, including sovereign immunity, "stands upon principles of public comity and convenience, and arises from the presumed consent or license of nations." *Id.,* at 353. Accordingly, Justice Story explained, the right to assert sovereign immunity "*may be withdrawn upon notice at any time, without just offence.*" *Ibid.* (emphasis added). Justice Story then held that the Argentine ship's cargo was not immune from seizure. *Id.,* at 354.

The Court in *Hall* relied on this reasoning. See 440 U. S., at 416–417. Drawing on the comparison to foreign nations, the Court in *Hall* emphasized that California had made a sovereign decision not to "exten[d] immunity to Nevada as a matter of comity." *Id.,* at 418. Unless some constitutional rule required California to grant immunity that it had chosen to withhold, the Court "ha[d] no power to disturb the judgment of the California courts." *Ibid.*

### B

The Court in *Hall* next held that ratification of the Constitution did not alter principles of state sovereign immunity in any relevant respect. The Court concluded that express provisions of the Constitution—such as the Eleventh Amendment and the Full Faith and Credit Clause of Article IV—did not require States to accord each other sovereign immunity. See *id.*, at 418–424. And the Court held that nothing "implicit in the Constitution" treats States differently in respect to immunity than international law treats sovereign nations. *Id.,* at 418; see also *id.,* at 424–427.

To the contrary, the Court in *Hall* observed that an express provision of the Constitution undermined the assertion that States were absolutely immune in each other's courts. Unlike suits brought against a State in the State's own courts, *Hall* noted, a suit against a State in the courts of a different State "necessarily implicates the power and authority of" both States. *Id.*, at 416. The defendant State has a sovereign interest in immunity from suit, while the forum State has a sovereign interest in defining the jurisdiction of its own courts. The Court in *Hall* therefore justified its decision in part by reference to "the Tenth Amendment's reminder that powers not delegated to the Federal Government nor prohibited to the States are reserved to the States or to the people." *Id.*, at 425. Compelling States to grant immunity to their sister

States would risk interfering with sovereign rights that the Tenth Amendment leaves to the States.

To illustrate that principle, *Hall* cited *Georgia* v. *Chattanooga*, 264 U. S. 472 (1924), which concerned condemnation proceedings brought by a municipality against property owned by a neighboring State. See *Hall*, 440 U. S., at 426, n. 29. The Court in *Chattanooga* held that one State (Georgia) that had purchased property for a railroad in a neighboring State (Tennessee) could not exempt itself from the eminent domain power of the Tennessee city in which the property was located. 264 U. S., at 480. The reason was obvious: "The power of eminent domain is an attribute of sovereignty," and Tennessee did not surrender that sovereign power simply by selling land to Georgia. *Ibid.* In light of the competing sovereignty interests on both sides of the matter, the Court in *Chattanooga* found no basis to interpose a federally mandated resolution.

Similar reasoning applied in *Hall*. Mandating absolute interstate immunity "by inference from the structure of our Constitution and nothing else" would "intru[de] on the sovereignty of the States—and the power of the people—in our Union." 440 U. S., at 426–427.

## II

The majority disputes both *Hall*'s historical conclusion regarding state immunity before ratification and its conclusion that the Constitution did not alter that immunity. But I do not find the majority's arguments convincing.

## A

The majority asserts that before ratification "it was well settled that States were immune under both the common law and the law of nations." *Ante*, at 9. The majority thus maintains that States were exempt from suit in each other's courts.

But the question in *Hall* concerned the *basis* for that

exemption. Did one sovereign have an absolute right to an exemption from the jurisdiction of the courts of another, or was that exemption a customary matter, a matter of consent that a sovereign might withdraw? As to that question, nothing in the majority's opinion casts doubt on *Hall*'s conclusion that States—like foreign nations—were accorded immunity as a matter of consent rather than absolute right.

The majority refers to "the founding era's foremost expert on the law of nations," Emer de Vattel, who stated that a "sovereign is 'exempt from all foreign jurisdiction.'" *Ante*, at 7 (quoting 4 E. de Vattel, The Law of Nations 486 (J. Chitty ed. 1883) (Vattel); alterations omitted). But Vattel made clear that the source of a sovereign's immunity in a foreign sovereign's courts is the "'consen[t]'" of the foreign sovereign, which, he added, reflects a "'tacit convention'" among nations. *Schooner Exchange*, 7 Cranch, at 143 (quoting 4 Vattel 472). And *Schooner Exchange* and *Santissima Trinidad* underscore that such a tacit convention can be rejected, and that consent can be "withdrawn upon notice at any time." *Santissima Trinidad*, 7 Wheat., at 353.

The majority also draws on statements of the Founders concerning the importance of sovereign immunity generally. But, as *Hall* noted, those statements concerned matters entirely distinct from the question of state immunity at issue here. Those statements instead "concerned questions of *federal-court* jurisdiction and the extent to which the States, by ratifying the Constitution and creating federal courts, had authorized suits against themselves in those courts." 440 U. S., at 420–421 (emphasis added). That issue was "a matter of importance in the early days of independence," for it concerned the ability of holders of Revolutionary War debt owed by States to collect that debt in a federal forum. *Id.,* at 418. There is no evidence that the Founders who made those statements intended to

express views on the question before us. And it seems particularly unlikely that John Marshall, one of those to whom the Court refers, see *ante*, at 10–11, would have held views of the law in respect to States that he later repudiated in respect to sovereign nations.

The majority cites *Nathan* v. *Virginia*, 1 Dall. 77, n. (C. P. Phila. Cty. 1781). As the majority points out, that case involved a Pennsylvania citizen who filed a suit in Pennsylvania's courts seeking to attach property belonging to Virginia. The Pennsylvania Court of Common Pleas accepted Virginia's claim of sovereign immunity and dismissed the suit. But it did so only after "delegates in Congress from Virginia . . . applied to the supreme executive council of Pennsylvania" for immunity, and Pennsylvania's Attorney General, representing its Executive, asked the court to dismiss the case. *Id.,* at 78, n. The Pennsylvania court thus granted immunity only after Virginia "followed the usual diplomatic course." Pfander, Rethinking the Supreme Court's Original Jurisdiction in State-Party Cases, 82 Cal. L. Rev. 555, 585 (1994). Given the participation of Pennsylvania's Executive in this diplomatic matter, the case likely involved Pennsylvania's consent to a claim of sovereign immunity, rather than a view that Virginia had an absolute right to immunity.

B

The majority next argues that "the Constitution affirmatively altered the relationships between the States" by giving them immunity that they did not possess when they were fully independent. *Ante*, at 13. The majority thus maintains that, whatever the nature of state immunity before ratification, the Constitution accorded States an absolute immunity that they did not previously possess.

The most obvious problem with this argument is that no provision of the Constitution gives States absolute immunity in each other's courts. The majority does not attempt

to situate its newfound constitutional immunity in any provision of the Constitution itself. Instead, the majority maintains that a State's immunity in other States' courts is "implicit" in the Constitution, *ante*, at 16, "embed[ded] . . . within the constitutional design," *ante*, at 13*,* and reflected in "'the plan of the Convention,'" *ante*, at 9. See also *Hall*, 440 U. S., at 430 (Blackmun, J., dissenting) (arguing that immunity in this context is found "not in an express provision of the Constitution but in a guarantee that is implied as an essential component of federalism").

I agree with today's majority and the dissenters in *Hall* that the Constitution contains implicit guarantees as well as explicit ones. But, as I have previously noted, concepts like the "constitutional design" and "plan of the Convention" are "highly abstract, making them difficult to apply"—at least absent support in "considerations of history, of constitutional purpose, or of related consequence." *Federal Maritime Comm'n* v. *South Carolina Ports Authority*, 535 U. S. 743, 778 (2002) (BREYER, J., dissenting). Such concepts "invite differing interpretations at least as much as do the Constitution's own broad liberty-protecting phrases" such as "'due process'" and "'liberty,'" and "they suffer the additional disadvantage that they do not actually appear anywhere in the Constitution." *Ibid.*

At any rate, I can find nothing in the "plan of the Convention" or elsewhere to suggest that the Constitution converted what had been the customary practice of extending immunity by consent into an absolute federal requirement that no State could withdraw. None of the majority's arguments indicates that the Constitution accomplished any such transformation.

The majority argues that the Constitution sought to preserve States' "equal dignity and sovereignty." *Ante*, at 13. That is true, but tells us nothing useful here. When a citizen brings suit against one State in the courts of another, both States have strong sovereignty-based interests.

In contrast to a State's power to assert sovereign immunity in its own courts, sovereignty interests here lie on both sides of the constitutional equation.

The majority also says—also correctly—that the Constitution demanded that States give up certain sovereign rights that they would have retained had they remained independent nations. From there the majority infers that the Constitution must have implicitly given States immunity in each other's courts to provide protection that they gave up when they entered the Federal Union.

But where the Constitution alters the authority of States vis-à-vis other States, it tends to do so explicitly. The Import-Export Clause cited by the majority, for example, creates "harmony among the States" by preventing them from "burden[ing] commerce . . . among themselves." *Michelin Tire Corp.* v. *Wages*, 423 U. S. 276, 283, 285 (1976). The Full Faith and Credit Clause, also invoked by the majority, prohibits States from adopting a "policy of hostility to the public Acts" of another State. *Franchise Tax Bd. of Cal.* v. *Hyatt*, 578 U. S. \_\_\_, \_\_\_ (2016) (slip op., at 2). By contrast, the Constitution says nothing explicit about interstate sovereign immunity.

Nor does there seem to be any need to create implicit constitutional protections for States. As the history of this case shows, the Constitution's express provisions seem adequate to prohibit one State from treating its sister States unfairly—even if the State permits suits against its sister States in its courts. See *id.*, at \_\_\_ (slip op., at 4) (holding that the Full Faith and Credit Clause prohibits Nevada from subjecting the Board to greater liability than Nevada would impose upon its own agency in similar circumstances).

The majority may believe that the distinction between permissive and absolute immunity was too nuanced for the Framers. The Framers might have understood that most nations did in fact allow other nations to assert

sovereign immunity in their courts. And they might have stopped there, ignoring the fact that, under international law, a nation had the sovereign power to change its mind.

But there is simply nothing in the Constitution or its history to suggest that anyone reasoned in that way. No constitutional language supports that view. Chief Justice Marshall, Justice Story, and the Court itself took a somewhat contrary view without mentioning the matter. And there is no strong reason for treating States differently than foreign nations in this context. Why would the Framers, silently and without any evident reason, have transformed sovereign immunity from a permissive immunity predicated on comity and consent into an absolute immunity that States must accord one another? The Court in *Hall* could identify no such reason. Nor can I.

## III

In any event, *stare decisis* requires us to follow *Hall*, not overrule it. See *Planned Parenthood of Southeastern Pa.* v. *Casey*, 505 U. S. 833, 854–855 (1992); see also *Kimble* v. *Marvel Entertainment, LLC*, 576 U. S. ___, ___–___ (2015) (slip op., at 7–8). Overruling a case always requires "'special justification.'" *Kimble*, 576 U. S., at ___ (slip op., at 8). What could that justification be in this case? The majority does not find one.

The majority believes that *Hall* was wrongly decided. But "an argument that we got something wrong—even a good argument to that effect—cannot by itself justify scrapping settled precedent." *Kimble*, 576 U. S., at ___ (slip op., at 8). Three dissenters in *Hall* also believed that *Hall* was wrong, but they recognized that the Court's opinion was "plausible." 440 U. S., at 427 (opinion of Blackmun, J.). While reasonable jurists might disagree about whether *Hall* was correct, that very fact—that *Hall* is not obviously wrong—shows that today's majority is obviously wrong to overrule it.

The law has not changed significantly since this Court decided *Hall*, and has not left *Hall* a relic of an abandoned doctrine. To the contrary, *Hall* relied on this Court's precedent in reaching its conclusion, and this Court's subsequent cases are consistent with *Hall*. As noted earlier, *Hall* drew its historical analysis from earlier decisions such as *Schooner Exchange,* written by Chief Justice Marshall. And our post-*Hall* decisions regarding the immunity of foreign nations are consistent with those earlier decisions. The Court has recently reaffirmed "Chief Justice Marshall's observation that foreign sovereign immunity is a matter of grace and comity rather than a constitutional requirement." *Republic of Austria* v. *Altmann*, 541 U. S. 677, 689 (2004). And the Court has reiterated that a nation may decline to grant other nations sovereign immunity in its courts. *Verlinden B. V.* v. *Central Bank of Nigeria*, 461 U. S. 480, 486 (1983).

Nor has our understanding of state sovereign immunity evolved to undermine *Hall*. The Court has decided several state sovereign immunity cases since *Hall,* but these cases have all involved a State's immunity in a federal forum or in the State's own courts. Compare *Federal Maritime Comm'n*, 535 U. S., at 769 (state immunity in a federal forum); *Seminole Tribe of Fla.* v. *Florida*, 517 U. S. 44, 47 (1996) (same); *Blatchford* v. *Native Village of Noatak*, 501 U. S. 775, 782 (1991) (same), with *Alden* v. *Maine*, 527 U. S. 706, 715 (1999) (state immunity in a State's "own courts"); *Will* v. *Michigan Dept. of State Police*, 491 U. S. 58, 67 (1989) (same). None involved immunity asserted by one State in the courts of another. And our most recent case to address *Hall* in any detail endorses it. See *Alden*, 527 U. S., at 739–740 (noting that *Hall*'s distinction "between a sovereign's immunity in its own courts and its immunity in the courts of another sovereign" is "consistent with, and even support[s]," modern cases).

The dissenters in *Hall* feared its "practical implica-

tions." 440 U. S., at 443 (opinion of Rehnquist, J.). But I can find nothing in the intervening 40 years to suggest that this fear was well founded. The Board and its *amici* have, by my count, identified only 14 cases in 40 years in which one State has entertained a private citizen's suit against another State in its courts. See Brief for Petitioner 46–47; Brief for State of Indiana et al. as *Amici Curiae* 13–14. In at least one of those 14 cases, moreover, the state court eventually agreed to dismiss the suit against its sister State as a matter of comity. See *Montaño* v. *Frezza*, 2017–NMSC–015, 393 P. 3d 700, 710. How can it be that these cases, decided over a period of four decades, show *Hall* to be unworkable?

The *Hall* issue so rarely arises because most States, like most sovereign nations, are reluctant to deny a sister State the immunity that they would prefer to enjoy reciprocally. Thus, even in the absence of constitutionally mandated immunity, States normally grant sovereign immunity voluntarily. States that fear that this practice will be insufficiently protective are free to enter into an interstate compact to guarantee that the normal practice of granting immunity will continue. See *Cuyler* v. *Adams*, 449 U. S. 433, 440 (1981).

Although many States have filed an *amicus* brief in this case asking us to overturn *Hall,* I can find nothing in the brief that indicates that reaffirming *Hall* would affront "the dignity and respect due sovereign entities." *Federal Maritime Comm'n*, 535 U. S., at 769. As already explained, sovereign interests fall on both sides of this question. While reaffirming *Hall* might harm States seeking sovereign immunity, overruling *Hall* would harm States seeking to control their own courts.

Perhaps the majority believes that there has been insufficient reliance on *Hall* to justify preserving it. But any such belief would ignore an important feature of reliance. The people of this Nation rely upon stability in the law.

Legal stability allows lawyers to give clients sound advice and allows ordinary citizens to plan their lives. Each time the Court overrules a case, the Court produces increased uncertainty. To overrule a sound decision like *Hall* is to encourage litigants to seek to overrule other cases; it is to make it more difficult for lawyers to refrain from challenging settled law; and it is to cause the public to become increasingly uncertain about which cases the Court will overrule and which cases are here to stay.

I understand that judges, including Justices of this Court, may decide cases wrongly. I also understand that later-appointed judges may come to believe that earlier-appointed judges made just such an error. And I understand that, because opportunities to correct old errors are rare, judges may be tempted to seize every opportunity to overrule cases they believe to have been wrongly decided. But the law can retain the necessary stability only if this Court resists that temptation, overruling prior precedent only when the circumstances demand it.

\*    \*    \*

It is one thing to overrule a case when it "def[ies] practical workability," when "related principles of law have so far developed as to have left the old rule no more than a remnant of abandoned doctrine," or when "facts have so changed, or come to be seen so differently, as to have robbed the old rule of significant application or justification." *Casey*, 505 U. S., at 854–855. It is far more dangerous to overrule a decision only because five Members of a later Court come to agree with earlier dissenters on a difficult legal question. The majority has surrendered to the temptation to overrule *Hall* even though it is a well-reasoned decision that has caused no serious practical problems in the four decades since we decided it. Today's decision can only cause one to wonder which cases the Court will overrule next. I respectfully dissent.