# State of New York
# Court of Appeals

OPINION

This opinion is uncorrected and subject to revision
before publication in the New York Reports.

No. 11
Kathleen Henry,
     Respondent,
   v.
New Jersey Transit Corporation et
al.,
     Appellants,
et al.,
     Defendant.

Lawrence McGivney, for appellants.
Brian J. Isaac, for respondent.
Valbona Fetahu, New York Trial Lawyers' Association, amici curiae.

SINGAS, J.:

The question before us is whether we have power to hear this appeal under NY

Constitution article VI, § 3 and CPLR 5601 (b) (1). To answer this threshold issue, we

must consider the jurisdictional nature of interstate sovereign immunity to ascertain

- 1 -

whether defendants' sovereign immunity defense is exempt from our general preservation rules. We conclude that a state must preserve its interstate sovereign immunity defense by raising it before the trial court, and no exception to the general preservation rule applies. Because defendants asserted their sovereign immunity defense for the first time on appeal after the United States Supreme Court decided *Franchise Tax Bd. of Cal. v Hyatt* (587 US —, 139 S Ct 1485 [2019] [hereinafter *Hyatt III*]), the argument is unpreserved in this case and there is no directly involved constitutional question supporting this appeal as of right. The appeal should therefore be dismissed.

I.

In 2014, plaintiff Kathleen Henry sustained injuries while riding on a bus owned by defendant New Jersey Transit Corporation and driven by defendant Renaud Pierrelouis (collectively, NJT) when it collided with a vehicle driven by defendant Chen Nakar[1] in the Lincoln Tunnel. Plaintiff commenced this action in June 2015, seeking to recover for the injuries she sustained in the accident. Following trial, the jury found in plaintiff's favor and awarded her damages. NJT moved pursuant to CPLR 4404 (a) to set aside the verdict and for a new trial on damages, or to reduce the damages awarded by the jury. Supreme Court denied NJT's motion (*see* 2019 NY Slip Op 31903[U] [Sup Ct, NY County 2019]).

On appeal, relying on the U.S. Supreme Court's decision in *Hyatt III*—which was decided on May 13, 2019, after NJT's posttrial motion was briefed but before it was

---

[1] Nakar was awarded summary judgment and the action was dismissed as against him before trial (*see* Sup Ct, NY County, June 6, 2018, Silvera, J., index No. 156496/2015). No appeal was taken from that order.

decided—NJT argued for the first time in this litigation that the action should be dismissed under the doctrine of interstate sovereign immunity. NJT asserted that under *Hyatt III*, which overruled prior controlling precedent on the issue (*see Nevada v Hall*, 440 US 410 [1979]), the instant action should be dismissed because New Jersey Transit Corporation, assertedly an arm of the State of New Jersey, and Pierrelouis, an employee who was acting within the scope of employment at the time of the accident, did not consent to suit in New York's courts. NJT alternatively asserted that the trial court should have ordered a new trial on damages or reduced the damages award.

The Appellate Division affirmed Supreme Court's order denying NJT's posttrial motions and rejected its new sovereign immunity argument (*see* 195 AD3d 444 [1st Dept 2021]). The Court held that NJT waived its sovereign immunity defense through its litigation conduct, reasoning that NJT "did not place plaintiff or the court on notice of the defense by asserting it in its responsive pleadings, during pretrial litigation, at trial or in its posttrial motion. Indeed, it raised the issue for the first time on appeal" (*id.* at 445, citing *Belfand v Petosa*, 196 AD3d 60 [1st Dept 2021]). The Court further noted that, "[a]s the defense pre-dates [*Hyatt III*], and thus was available at the time [NJT] served its answer, '[its] litigation conduct induced substantial reliance on that conduct by plaintiff and our courts, and is inescapably a clear declaration to have our courts entertain this action' " (*id.*, quoting *Belfand*, 196 AD3d at 73).

In July 2021, Supreme Court entered judgment in plaintiff's favor against NJT. NJT subsequently filed this appeal as of right from the final judgment seeking to bring up for review the prior nonfinal Appellate Division order which, according to NJT, directly

involved a substantial constitutional question and necessarily affected the final judgment (*see* CPLR 5601 [b] [1]; [d]).

## II.

This Court's power to hear an appeal is limited by New York's Constitution and, in civil cases, the CPLR. NJT asserts that its appeal lies pursuant to CPLR 5601 (b) (1), which permits an appeal as of right "from an order of the appellate division which finally determines an action where there is *directly involved* the construction of the constitution of the state or of the United States" (emphasis added; *see* NY Const, art VI, § 3 [b] [1]). For a constitutional question to be directly involved it must, among other things, be preserved as a question of law (*see Matter of Schulz v State of New York*, 81 NY2d 336, 344 [1993]; *Matter of Shannon B.*, 70 NY2d 458, 462 [1987]; *see also Madireddy v Madireddy*, 14 NY3d 765, 765 [2010]). Thus, "the constitutional question on the basis of which the appeal as of right is taken must have been properly raised in the courts below. Otherwise, . . . the appeal must be dismissed" (Arthur Karger, Powers of the New York Court of Appeals § 7:4 [3d ed rev, Aug. 2022 update]).[2] This is because NY Constitution article VI, § 3 (a)

---

[2] The dissent, without basis, constructs a false narrative in suggesting that a litigant's failure to preserve an issue "transmutes it from a question of law to not a question of law" (dissenting op at 10). It is well settled that an unpreserved issue does not raise a "question of law" as we have defined that term under our constitutional and statutory system (*see* Karger, Powers of the New York Court of Appeals §§ 6:5, 7:4).

limits our "jurisdiction . . . to the review of questions of law," except in cases not relevant here (*see also* CPLR 5501 [b]).[3]

In general, arguments, including constitutional challenges, are preserved only if presented at the trial court level (*see Matter of McGovern v Mount Pleasant Cent. Sch. Dist.*, 25 NY3d 1051, 1053 [2015]; *Matter of Barbara C.*, 64 NY2d 866, 868 [1985]). To demonstrate that a question of law is preserved for this Court's review, a party must show that it "raise[d] the specific argument in Supreme Court and ask[ed] the court to conduct that analysis in the first instance" (*U.S. Bank N.A. v DLJ Mtge. Capital, Inc.*, 33 NY3d 84, 89 [2019] [internal quotation marks and alterations omitted]). Certain circumstances exist in which the general preservation requirement does not apply. As relevant here, "[a] judgment or order issued without subject matter jurisdiction is void, and that defect may be raised at any time and may not be waived" (*Editorial Photocolor Archives v Granger Collection*, 61 NY2d 517, 523 [1984]) because it goes to the "competence" of the court (*Lacks v Lacks*, 41 NY2d 71, 75 [1976]; *see Matter of Fry v Village of Tarrytown*, 89 NY2d 714, 718 [1997]; Karger, Powers of the New York Court of Appeals § 17:5 ["a claim of lack of subject matter jurisdiction . . . may be raised at any time because a jurisdictional defect may not be waived"]).

In this case, NJT failed to raise its sovereign immunity argument in Supreme Court and, thus, that issue is unpreserved. However, NJT argues that a sovereign immunity

---

[3] These settled maxims belie the dissent's mistaken view that the preservation requirement is a "[c]laim-processing rule[ ]" or "docket-management tool" (dissenting op at 5, 8).

defense can be raised for the first time on appeal because such a defense, if established, would deprive New York courts of subject matter jurisdiction over this personal injury action. Thus, the threshold question for this Court is whether we may entertain this appeal filed by NJT as of right pursuant to CPLR 5601 (b) (1). This requires us to determine if NJT's sovereign immunity argument implicates the subject matter jurisdiction of our state courts, thereby falling within a narrow exception to the preservation rule. In these unusual circumstances, we must address that substantive issue to the extent necessary to determine the procedural question of whether NJT is entitled to an appeal as of right.

III.

Sovereign immunity encompasses three distinct concepts: the immunity that states enjoy from suits in federal courts, the immunity they enjoy from suits in other states' courts (or "interstate sovereign immunity"), and the immunity they enjoy in their own courts. Only the second is implicated here.

Sovereign immunity derives from the common-law premise that "no suit or action can be brought against the king, even in civil matters, because no court can have jurisdiction over him" (1 William Blackstone, Commentaries on the Laws of England at 235 [1765]; *see Hyatt III*, 587 US at —, 139 S Ct at 1493; *see also Glassman v Glassman*, 309 NY 436, 440 [1956]). Because "all jurisdiction implies superiority of power," no authority could hear a case "unless that court had a power to command the execution of it; but who . . . shall command the king?" (1 Blackstone at 235). Though the king could never be haled into court through "compulsion" the king could, upon a "just demand," consent to private suit "as a matter of grace" (*id.* at 236). Sovereign immunity also emanates from

the conceit of "the perfect equality and absolute independence of sovereigns under . . . international law" (*Hyatt III*, 587 US at —, 139 S Ct at 1493 [internal quotation marks omitted]).

"After independence, the States considered themselves fully sovereign nations . . . with 'full Power to levy War, conclude Peace, contract Alliances, establish Commerce, and to do all other Acts and Things which Independent States may of right do' " (*id.*, 587 US at —, 139 S Ct at 1493, quoting Declaration of Independence ¶ 4, 1 US Stat 1, 3 [1776]). Consistent with pre-independence English common law and prevailing international law, the states accordingly considered themselves immune from suit (*see Alden v Maine*, 527 US 706, 713 [1999]).

At the time of the Constitutional Convention, the founders "took as given that States could not be haled involuntarily before each other's courts," seeing as "[i]t is inherent in the nature of sovereignty not to be amenable to the suit of an individual without its consent" (Hamilton, Federalist No. 81).  Thus, the founders understood that a court could not assert jurisdiction over a state unless the state "condescended to be a party" (Debates of the Virginia Convention [June 20, 1788], at 1412, 1414).  Nonetheless, the Constitution's text was silent as to whether, as a general matter, states acceding to the union would maintain or give up the sovereign immunity they previously enjoyed as a confederation of states. The only mention of suits between states and individuals was in article III, § 2, clause 1, which governs the extent of a federal court's jurisdiction.

Centuries later, in *Nevada v Hall*, the Supreme Court held that the Constitution did not grant states automatic immunity from suit in the courts of another state because the

Constitution is silent on that issue (*see generally* 440 US 410). The Court instead treated the issue as keeping with international-law notions of immunity: the decision for one state to extend immunity to another state in its own courts was a matter of comity for the forum state to decide (*id.* at 421, 425). Whether to extend immunity, though, was constrained by the Constitution's Full Faith and Credit Clause (*see id.* at 421-424; *see also* US Const, art IV, § 1, cl 1), requiring each state to grant other states the same degree of sovereign immunity the other state would afford itself in its own courts, unless doing so would violate the forum state's public policy (*see Hall*, 440 US at 422).

In 2019, in *Hyatt III*, the Supreme Court overruled *Hall*'s core holding that the Constitution does not guarantee interstate sovereign immunity. It determined that the Constitution

> "altered the relationships between the States, so that they no longer relate to each other solely as foreign sovereigns. Each State's equal dignity and sovereignty under the Constitution implies certain constitutional limitations on the sovereignty of all of its sister States. One such limitation is the inability of one State to hale another into its courts without the latter's consent" (*Hyatt III*, 587 US at —, 139 S Ct at 1497 [internal quotation marks, citation, and alteration omitted]).

*Hall*'s conception of immunity based on principles of comity did not, according to the Court, reflect the altered relationships among the states under the framework of the Constitution (*see id.*, 587 US at —, 139 S Ct at 1497-1498) and the pre-ratification recognition that "States were immune under both the common law and the law of nations" (*id.*, 587 US at —, 139 S Ct at 1494). The Court thus concluded that "interstate sovereign immunity is . . . integral to the structure of the Constitution" and "implied as an essential

component of federalism" (*id.*, 587 US at —, 139 S Ct at 1498 [internal quotation marks omitted]). This holding brought the doctrine of interstate sovereign immunity in line with other state sovereign immunity concepts, clarifying that all state sovereign immunity derives from the structure of the Constitution which confirmed and retained pre-ratification notions of state sovereign immunity " 'except as altered by the plan of the Convention or certain constitutional Amendments' " (*see id.*, 587 US at —, 139 S Ct at 1494-1495, quoting *Alden*, 527 US at 713). Thus, the Court abandoned *Hall*'s full-faith-and-credit framework in favor of granting states a broad right to assert their immunity in any proceeding brought against them in another state's courts. Following *Hyatt III*, one state may not refuse to respect another state's properly asserted sovereign immunity defense (*see id.*, 587 US at —, 139 S Ct at 1492, 1498).

## IV.

It is undisputed that NJT raised its sovereign immunity argument for the first time before the Appellate Division. NJT's contention that its failure to preserve the claim should be excused because it could not have known that *Hyatt III* would be decided merits little discussion. *Hyatt III* did not create the interstate sovereign immunity doctrine, and NJT could have raised a general sovereign immunity argument at any point before the trial court (*see Belfand*, 196 AD3d at 72-73). Further, even before *Hyatt III* was decided, the Supreme Court made clear in April 2016 that it was "equally divided" on the issue eventually resolved in *Hyatt III* (*Franchise Tax Bd. of Cal. v Hyatt*, 578 US 171, 173 [2016] [*Hyatt II*]). In any event, *Hyatt III* was decided before Supreme Court resolved NJT's posttrial motions, but NJT took no action before that court asking for dismissal on sovereign

immunity grounds. In short, NJT could have asserted its sovereign immunity defense at Supreme Court, and *Hyatt III*'s timing does not excuse NJT from its failure to do so.

NJT's thornier argument is that its sovereign immunity defense may be raised at any time because that doctrine goes to the subject matter jurisdiction of the New York courts to entertain this action. As explained above, we have held that a claim that the courts below lack subject matter jurisdiction need not be preserved (*see Cappiello v Cappiello*, 66 NY2d 107, 108 [1985]; *Editorial Photocolor Archives*, 61 NY2d at 523). However, the interstate sovereign immunity that NJT seeks to assert here presents no such exception.

Subject matter jurisdiction is a "power to adjudge concerning the general question involved" in litigation, and "is not dependent upon the state of facts which may appear in a particular case" (*Hunt v Hunt*, 72 NY 217, 229 [1878]). " 'The question of subject matter jurisdiction is a question of judicial power: whether the court has the power, conferred by the Constitution or statute, to entertain the case before it' " (*Matter of Ballard v HSBC Bank USA*, 6 NY3d 658, 663 [2006], quoting *Matter of Fry*, 89 NY2d at 718). It "cannot be dispensed with by litigants" because litigants cannot expand a court's power by consent or agreement (*Shea v Export S.S. Corp.*, 253 NY 17, 21 [1930]; *see Union Pacific R. Co. v Locomotive Engineers*, 558 US 67, 81 [2009] ["Subject-matter jurisdiction properly comprehended . . . refers to a tribunal's power to hear a case" and "can never be forfeited or waived" (internal quotation marks omitted)]).

Personal jurisdiction is a different concept that refers to a court's power to exert legal authority over specific parties (*see Reed v Chilson*, 142 NY 152, 155-156 [1894]; *see also Keane v Kamin*, 94 NY2d 263, 265 [1999]). An objection to personal jurisdiction may

be forfeited by a party's failure to timely assert it or expressly waived, such as when a party consents to a tribunal's authority to adjudicate the merits of a dispute (*see* CPLR 3211 [e]; *Addesso v Shemtob*, 70 NY2d 689, 690 [1987]).  When a personal jurisdiction defense is properly asserted, a court must determine whether it may exercise such jurisdiction under our long-arm statute and the New York and federal constitutions.  A state court may constitutionally exercise personal jurisdiction over a party when that party is generally "amenable to suit" because it is "essentially at home" in the state (*Daimler AG v Bauman*, 571 US 117, 125, 127 [2014] [internal quotation marks omitted]) or "should reasonably anticipate being haled into court" because of its contacts with the state (*State of New York v Vayu, Inc.* 39 NY3d —, 2023 NY Slip Op 00801, *4 [2023] [internal quotation marks omitted]).

Hyatt III* accepted that interstate sovereign immunity is waivable based on litigation conduct (*see Hyatt III*, 587 US at —, 139 S Ct at 1491 n 1; *cf. Aboujdid v Singapore Airlines*, 67 NY2d 450, 454, 459 [1986]).[4]  Arguments or defenses that are waivable are generally subject to our preservation rule.  The Supreme Court's determination that interstate sovereign immunity is waivable fatally undermines NJT's argument that interstate sovereign immunity is rooted in subject matter jurisdiction because subject matter jurisdiction, as a rule, "cannot be dispensed with by litigants" (*Shea*, 253 NY at 21) and

---

[4] Drifting far afield from the issues needed to resolve this matter—even under its view of this case—the dissent proposes additional methods by which NJT might have waived its sovereign immunity defense, conflating principles of forfeiture, waiver, and consent to personal jurisdiction (*see e.g.* dissenting op at 24).  We limit our discussion to waiver by litigation conduct as that principle informs the threshold preservation issue.

"can never be forfeited or waived" (*Union Pacific R. Co.*, 558 US at 81 [internal quotation marks omitted]). Interstate sovereign immunity's waivability vitiates any legal justification for applying a broad exception to the general preservation requirement to such sovereign immunity claims.[5]

The history and nature of interstate sovereign immunity guide us to the conclusion that the doctrine more closely aligns with jurisdiction over a party, rather than over all subject matter concerning that party. In particular, interstate sovereign immunity is rooted and analyzed in terms of concepts such as a court's power over a party, a state's amenability to suit, its consent to be sued, and haling a party into court—all of which align closely with treatment of personal jurisdiction issues, not subject matter jurisdiction ones (*see Hyatt III*, 587 US at —, 139 S Ct at 1493, citing James E. Pfander, *Rethinking the Supreme Court's Original Jurisdiction in State-Party Cases*, 82 Cal L Rev 555, 581-588 [1994] and Caleb Nelson, *Sovereign Immunity as a Doctrine of Personal Jurisdiction*, 115 Harv L Rev 1559, 1574-1579 [2002]). As such, interstate sovereign immunity defenses do not fall within the subject-matter-jurisdiction exception to the general preservation requirement discussed above.

The cases that NJT cites concerning the State of New York's ability to raise sovereign immunity for the first time on appeal in Court of Claims matters do not require

---

[5] Similarly, while a court typically must raise a lack of subject matter jurisdiction on its own motion (*see Insurance Corp. of Ireland v Compagnie des Bauxites de Guinee*, 456 US 694, 702 [1982]; *Matter of Fry*, 89 NY2d at 718), a federal court need not raise the sovereign immunity "defect on its own. Unless the State raises the matter, a court can ignore it" (*Wisconsin Dept. of Corrections v Schacht*, 524 US 381, 389 [1998]).

a different result. Unlike our state Supreme Court, the Court of Claims has limited

jurisdiction as defined in the Court of Claims Act, and New York has statutorily waived

sovereign immunity only for causes of action falling with the Act's parameters (*see* Court

of Claims Act § 8; *Ferreira v City of Binghamton*, 38 NY3d 298, 307 [2022]). It is thus

the scope of the Court of Claims Act, rather than sovereign immunity, that limits the Court

of Claims' subject matter jurisdiction—the two concepts just happen to be coextensive in

that context because of the statutory scheme. Here there is no similar statutory limitation

on the ability of New York courts to hear disputes involving another state.

V.

Given that NJT's sovereign immunity argument is unpreserved and does not qualify

for any exception to the preservation requirement, an appeal as of right does not lie under

CPLR 5601 (b) (1). As our analysis demonstrates, the threshold question is whether NJT's

sovereign immunity argument qualifies for an exception to the preservation requirement.[6]

Nonetheless, the preservation issue itself, like the merits of NJT's sovereign immunity

claim,[7] is not directly involved because the Appellate Division did not address the issue

---

[6] Of course, in addition to appealing as of right under CPLR 5601 (b) (1), NJT could have moved for leave to appeal from the Appellate Division order, arguing that the preservation issue merited this Court's review (*see* CPLR 5602 [a]; *see e.g. Matter of Schulz*, 81 NY2d at 344; *Matter of Shannon B.*, 70 NY2d at 462). Indeed, following dismissal of this appeal, NJT could still move for leave to appeal (*see* CPLR 5514 [a]), though we have now resolved the issue that would be reviewable if we granted that motion.

[7] The Appellate Division, which has interest of justice jurisdiction, had the power to review whether, by its conduct, NJT waived its sovereign immunity argument without first addressing NJT's failure to properly preserve that defense in Supreme Court (*see U.S. Bank N.A.*, 33 NY3d at 89; *Hecker v State of New York*, 20 NY3d 1087, 1087 [2013]). While lack of preservation and waiver by litigation conduct each may hinder review of a litigant's

and, thus, it was not "decisive of the Appellate Division's determination" (Karger, Powers of the New York Court of Appeals § 7:8). Because no constitutional question is preserved and, thus, directly involved in this appeal as of right, the Court must dismiss it (*see* NY Const, art VI, § 3 [b] [1]; CPLR 5601 [b] [1]; *see also Matter of Schulz*, 81 NY2d at 344; *Matter of Shannon B.*, 70 NY2d at 462). An unpreserved issue, not subject to any preservation exception, may not be the predicate for an appeal as of right under CPLR 5601 (b) (1).[8]

Accordingly, the appeal should be dismissed, without costs, upon the ground that no substantial constitutional question is directly involved.

---

argument on the merits, they are different legal doctrines governed by distinct rules and bodies of precedent.

[8] These constraints are critical to maintaining this Court's proper role in the state constitutional design. Whether an appeal as of right lies to this Court in a certain case is a matter of state, not federal, law. In dismissing this appeal, we simply apply that well-settled and frequently-invoked law to the facts presented.

WILSON, J. (dissenting):

The majority begins by advising that "[t]he question before us is whether we have the power to hear this appeal under NY Constitution article VI, § 3" (majority op at 1). Yet, after a lengthy exegesis of significant constitutional issues dating back to Blackstone and our nation's founding, the majority concludes that "no substantial constitutional question is directly involved" in this case (majority op at 14). The majority's explanation for the incongruity is that because the defendant, New Jersey Transit (NJT), did not preserve its argument that it was entitled to sovereign immunity under *Franchise Tax Bd. of Cal. v Hyatt* (139 S Ct 1485 [2019] [hereinafter *Hyatt III*]), our preservation doctrine—

- 1 -

which it also claims is "not directly involved" in the case (*see* majority op at 13)—trumps NJT's sovereign immunity claim, meaning no constitutional issue is present. The majority does not say that NJT's failure to preserve a sovereign immunity argument itself constituted a waiver of sovereign immunity (*see* majority op at 13-14 n 7). Rather, it states that we do not need to consider the argument at all—NJT may, according to the majority, be unable to enforce a perfectly good sovereign immunity defense that it did not waive according to the waiver rules set by the Federal Constitution. That position is inconsistent not only with federal jurisprudence on jurisdiction, but also our own case law on preservation.

Turning to something more straightforward, Kathleen Henry was injured in New York when the NJT bus on which she was riding collided with a car. Buses, trains, and ferries operated by NJT transport more than a hundred thousand passengers into and out of New York City each day. NJT says that the Federal Constitution forbids the courts of New York from hearing any claim caused by its buses or trains when operating in New York. According to NJT, if one of its buses hits a New York pedestrian standing on a New York City sidewalk, the Federal Constitution bars the injured pedestrian from suing NJT in the courts of New York. Even if that pedestrian had never set foot in New Jersey, the only place in which suit could be brought would be in New Jersey, and only to the degree New Jersey decided, in its sole discretion, to allow such suits. Ms. Henry says she can sue NJT in the state in which she was injured, New York.

The majority does not opine on that dispute. The majority does not even opine on the Appellate Division's holding that NJT has waived its sovereign immunity by raising it too late. Instead, the majority says that we lack jurisdiction to determine whether we lack

jurisdiction over these parties. Therefore, we have jurisdiction to dismiss this case for lack of jurisdiction, thereby leaving in place the Appellate Division's decision, namely, that New York courts had jurisdiction over the case all along, and Ms. Henry can collect Supreme Court's $979,579.50 award in her favor (less the amounts covered by her own health insurance).

I propose a simpler resolution, which is the same as the Appellate Division arrived at: we have jurisdiction because New Jersey and NJT waived any right NJT had to claim sovereign immunity. NJT asserted its sovereign immunity defense more than five years after Ms. Henry sued and more than one year after the United States Supreme Court issued the opinion on which it now relies. By asserting sovereign immunity now, NJT would leave Ms. Henry without *any* forum in which to bring her suit. That type of strategic maneuvering belies the claim that NJT has been haled into a foreign court without its consent.

But even if NJT did not consent to our jurisdiction via its litigation conduct, it more fundamentally consented by operating in New York with the knowledge that persons in New York would inevitably be harmed by its actions. Like so many of the New Jerseyans and New Yorkers it carries, NJT has a foot in both New York and New Jersey. It operates a billion-dollar transportation business that, like a range of public and private carriers, ferries vast numbers of passengers into and out of New York each day. Those other carriers can be sued in New York courts for violating New York law. Our courts are vital not only for keeping New Yorkers—and New Jerseyans like Ms. Henry, for that matter—safe from NJT's operations within our borders, but for creating the conditions that make operating in

New York so lucrative for NJT in the first place.  Indeed, New Jersey itself recognizes the importance of subjecting NJT to judicial process and has already done so for claims arising in New Jersey.  NJT provides no compelling reason why Newark Penn Station should be governed by a different set of sovereign immunity rules than New York Penn Station.  New Jersey's respect for New York's equality and sovereignty requires it to consent to the same control it exercises over its own territory.

Thankfully, the majority's decision yields the correct outcome, albeit for the wrong reason: instead of affirming the Appellate Division's holding that NJT waived whatever sovereign immunity it might have claimed, the majority dismisses this appeal, leaving the Appellate Division's waiver holding in place.[1]  The jury's verdict in favor of Ms. Henry will stand and NJT will not be subjected to the power of an illegitimate tribunal.  But the majority's decision will not resolve problems going forward.  There have been many of these cases already and more are rolling down the pike (*e.g. Colt v New Jersey Tr. Corp.*, 206 AD3d 126, 127 [1st Dept 2022] ["The constitutional dilemma concerning the doctrine of sovereign immunity continues unabated"]; *Taylor v New Jersey Tr. Corp.*, 199 AD3d 540 [1st Dept 2021]; *Belfand v Petosa*, 196 AD3d 60 [1st Dept 2021]; *Fetahu v New Jersey Tr. Corp.*, 197 AD3d 1065 [1st Dept 2021]).  Lower courts will need our guidance with a relatively new and complicated doctrine.  By misapplying our preservation jurisprudence

---

[1] Neither the majority nor my dissent addresses whether NJT is entitled to sovereign immunity at all (*cf. Hess v Port Auth. Trans-Hudson Corp.*, 513 US 30 [1994]).  The majority concludes that the issue is not preserved and I conclude that any immunity would have been waived, rendering it unnecessary to consider that question.

and failing to address this recurring issue, the majority leaves NJT, future litigants, regulators, and lower courts in the dark.

## I.

The majority says that we need not determine whether NJT has asserted a valid jurisdictional objection because the defense was unpreserved, meaning that this case does not "directly involve[] the construction of the constitution of the state or of the United States" (NY Const, art VI, § 3 [b] [1]; *see* majority op at 4 [emphasis omitted]).  Here is the problem: NJT says the New York courts lacked the power to hear the case because of New Jersey's sovereign immunity.  If that is true, we are employing our preservation doctrine to permit the New York courts to assert jurisdiction where they have none.  If that is false, whether because of waiver or some other reason, we should just say so.  Instead, the majority assumes that—regardless of whether NJT has a valid and unwaived sovereign immunity claim—we may apply our docket-management tool to nullify a limit on our jurisdiction imposed by the Federal Constitution.  It further transforms our preservation doctrine, which was designed to help us "cope" with our historically "voluminous" caseload (*cf.* Karger, § 2:1) into a tool for *expanding* our reach by allowing us to assert jurisdiction over cases we otherwise might not be able to hear.  Because our preservation doctrine cannot confer jurisdiction over cases and parties when the Federal Constitution so forbids, I cannot join the majority.

Our preservation doctrine, on which the majority opinion rests, cannot allow us to avoid our constitutional obligation to resolve this dispute.  In prior cases, we have

dismissed appeals for lack of a preserved substantial constitutional question (*see* majority op at 14, citing *Matter of Schulz v State of New York*, 81 NY2d 336, 344 [1993]).  Those cases have not involved challenges to our jurisdiction, nor arguments that a jurisdictional challenge has been waived.  In New York, jurisdictional challenges are typically either immune from our preservation requirement (*see* majority op at 10) or, as with personal jurisdiction, subject to a waiver doctrine so strict that no unpreserved jurisdictional argument could possibly exist (*see* CPLR 3211 [e]; *Addesso v Shemtob*, 70 NY2d 689, 690 [1987] [internal quotation marks omitted] [noting that a party waives personal jurisdiction by failing to timely assert it]).

NJT's challenge falls squarely into our well-established exception to the preservation requirement for jurisdictional challenges to our authority (*see e.g. Matter of Kaplan (Blumenfeld)*, 8 NY2d 214, 220 [1960] ["this lack of a subpoena was not raised by appellant in the courts below but, being jurisdictional and conclusive, it may be acted on by us"]; *see generally* Arthur Karger, Powers of the New York Court of Appeals § 17:5 [3d ed rev, Aug. 2022 update]).  The majority's claim that we have a "*subject-matter-jurisdiction exception*" only (majority op at 12 [emphasis added]) ignores the underlying logic of our exception and rests on a false congruence of jurisdiction and waivability.

Moreover, Ms. Henry's waiver argument also falls into a second preservation exception because NJT could not have made any factual or legal countersteps between the time when it asserted its sovereign immunity defense and the point at which it advanced the argument here (*see generally Telaro v Telaro*, 25 NY2d 433, 439 [1969]).

A.

As the majority notes, " 'all jurisdiction implies superiority of power,' [and] no authority c[an] hear a case 'unless that court ha[s] a power to command the execution of it' " (majority op at 6, quoting 1 William Blackstone, Commentaries on the Laws of England at 235 [1765]).  If the constitution denies a court jurisdiction over a class of cases or a party, the court lacks "constitutional *power* to adjudicate the case" (*Reed Elsevier, Inc. v Muchnick*, 559 US 154, 160-161 [2010], quoting *Steel Co. v Citizens for Better Environment*, 523 US 83, 89 [1998]).  The *Hyatt III* Court stated that the Federal Constitution denies state courts jurisdiction over nonconsenting states: a "[s]tate's assertion of compulsory judicial process over another [s]tate involves a direct conflict between sovereigns. The Constitution implicitly strips [s]tates of any power they once had to refuse each other sovereign immunity, just as it denies them the power to resolve border disputes by political means" (*Hyatt III*, 139 S Ct at 1498; *see also id.* at 1495).

The fact that sovereign immunity can be waived does not make it any less jurisdictional when it has not been waived.  In the Eleventh Amendment context, the fact that the immunity may be waived by litigation conduct does not "vitiate[] any legal justification" (majority op at 12) for requiring a sovereign to preserve its immunity defense (*see Calderon v Ashmus*, 523 US 740, 745 n 2 [1998] ["the Eleventh Amendment is jurisdictional in the sense that it is a limitation on the federal court's judicial power, and therefore can be raised at any stage of the proceedings"]; *Pennhurst State School & Hosp. v Halderman*, 465 US 89, 99 [1984] ["The limitation deprives federal courts of any

jurisdiction to entertain such claims, and thus may be raised at any point in a proceeding" despite being waivable]; *Wisconsin Dept. of Corrections v Schacht*, 524 US 381, 395 [1998] [Kennedy, J., concurring] [Eleventh Amendment sovereign immunity represents a "departure from the usual rules of waiver"]).  Claim-processing rules like our preservation requirement cannot confer power on a tribunal where the Federal Constitution denies it.

Federal personal jurisdiction jurisprudence further demonstrates that waivability does not make a jurisdictional limit any less binding on a court.  The personal jurisdiction requirement "represents a restriction on judicial power" the same as subject-matter jurisdiction requirement (*Insurance Corp. of Ireland v Compagnie des Bauxites de Guinee*, 456 US 694, 702 [1982]).  Because "there is no unyielding jurisdictional hierarchy," federal courts without subject-matter jurisdiction over a case may hear the case anyway to the extent necessary to resolve questions of personal jurisdiction (*Ruhrgas AG v Marathon Oil Co.*, 526 US 574, 578 [1999]).  The fact that a party may waive a personal jurisdiction challenge does not make it any less "fundamental" (*id*. at 584).  Although "a jurisdictional defect [with respect to subject-matter jurisdiction] may not be waived" (Karger, § 17:5), a defect with respect to personal jurisdiction may be waived (*see Insurance Corp. of Ireland*, 456 US 694, 703-704 [1982]).  That difference, however, does not render the lack of personal jurisdiction nonjurisdictional.

Our jurisdictional exception to the preservation requirement is premised on the fundamental principle that we cannot hear a case over which we lack power and applies to all jurisdictional challenges to our authority (*see Editorial Photocolor Archives v Granger*

*Collection*, 61 NY2d 517, 523 [1984] ["A judgment or order issued without subject matter jurisdiction is void, and that defect may be raised at any time and may not be waived"]). A true jurisdictional defect in a judgment is "so fundamental to the power of adjudication of a court that [it] survive[s] even a final judgment or order" (*Lacks v Lacks*, 41 NY2d 71, 74-75 [1976]). Because a jurisdictional defect would "undermine the constitutional or statutory basis to hear a case" and invalidate the judgment, we do not apply our preservation requirement to jurisdictional defects (*see Matter of Ballard*, 6 NY3d at 663; *Ocean Accident & Guarantee Corp., Ltd. v Otis Elevator Co.*, 291 NY 254, 255 [1943] ["This court possesses only those powers which are conferred by the Constitution . . . . (s)uch powers . . . may not be enlarged by consent of the parties"]; *People v Nicometi*, 12 NY2d 428, 431 [1963] ["Want of jurisdiction is a basic defect, not a trial error . . . [s]ince this defect would undoubtedly be grounds for the issuance of a writ of habeas corpus, it most assuredly can be remedied on appeal"]). As with subject-matter jurisdiction, "[t]he question of [sovereign immunity] is a question of judicial power: whether the court has the power, conferred by the Constitution or statute, to entertain the case before it" (*see* majority op at 10, quoting *Matter of Ballard v HSBC Bank USA*, 6 NY3d 658, 663 [2006]). As a matter of Federal Constitutional law, a judgment rendered by a court without jurisdiction over a party is invalid and not entitled to the respect of other courts (*see V.L.*, 577 US at 407; *Bristol-Myers Squibb Co. v Superior Court of California, San Francisco County*, 137 S Ct 1773, 1776 [2017]).

The fact that subject-matter jurisdiction cannot be waived and may be raised by a court *sua sponte* (*see* majority op at 10-12) is a consequence of the way in which subject-matter jurisdiction limits our power: that is, it is the kind of limit on our authority that cannot be cured by the consent of the parties. When we articulated the jurisdictional exception to preservation in *Editorial Photocolor Archives*, we did not say that a judgment issued without subject-matter jurisdiction could be raised at any time *because* it was waivable—rather, we said that it could be raised at any time "*and* may not be waived" (61 NY2d at 523 [emphasis added]). But other jurisdictional limits—like personal jurisdiction—can be overcome by the consent of the parties. Subject-matter jurisdiction's lack of waivability is not the *reason* we do not apply our preservation requirement to issues of subject-matter jurisdiction. Rather, we do not apply preservation in that context because our preservation doctrine is a prudential tool that can serve the interests of judicial economy and finality but cannot enhance our jurisdiction.

The majority defends its decision with nested legal fictions. The first is that unpreserved questions of law are somehow no longer questions of law (*see* majority op at 4 n 2). The New York Constitution vests our court with jurisdiction "limited to the review of questions of law" (art VI, § 3 [a]). Our case law does not explain how a litigant's failure to raise a purely legal question at the right time transmutes it from a question of law to not a question of law. In moments of candor, we have admitted that our claim that unpreserved questions of law are not questions of law is rooted in prudential considerations, sometimes used to deny ourselves jurisdiction. Even in the criminal context, where the preservation-

as-jurisdictional argument is on stronger—though not decisive—legal footing (*see* CPL 470.05 [2]), we have acknowledged that "[t]he requirement that a claim must be timely raised in order to create a question of law is grounded in large part in the need to preserve limited judicial resources and avoid untoward delay in the resolution of criminal proceedings," even as we have asserted that preservation is jurisdictional (*People v Michael*, 48 NY2d 1, 6 [1979]).  But that legal fiction proves too much.  If preservation were truly jurisdictional, we would not be able to create exceptions "when common sense and practical necessity dictate that we should" (*Misicki v Caradonna*, 12 NY3d 511, 525-526 [2009] [Smith, J., dissenting]).  Instead, when applying our requirement seems harsh, we have dispensed with it altogether, as when "certain principles of law are deemed so fundamental to our criminal justice system that a claimed violation of those principles creates a question of law despite the failure to timely raise that claim in the courts below" (*Michael*, 48 NY2d at 6).

The majority does not, as in those other cases, simply ignore the fiction that unpreserved questions of law are not questions of law.  Instead, it turns to a nineteenth-century case in which we said: "[j]urisdiction of the subject-matter, is power to adjudge concerning the general question involved, and is not dependent upon the state of facts which may appear in a particular case, arising, or which is claimed to have arisen, under that general question" (*Hunt v Hunt*, 72 NY 217, 229 [1878]; *see* majority op at 10). Whereas the "unpreserved-questions-of-law-are-not-questions-of-law" fiction renders legal questions unreachable, the "subject-matter-jurisdiction-does-not-involve-facts"

fiction operates in reverse. Taken as a serious proposition, however, that second fiction fares no better than the first: the framing of a general question of subject-matter jurisdiction often depends on facts. Examples of such questions reviewable by us under the jurisdictional exception abound: "[w]hether the essential nature of the claim is to recover money, or whether the monetary relief is incidental to the primary claim," an inquiry that "is dependent upon the facts and issues presented in a particular case" (*see Matter of Gross v Perales*, 72 NY2d 231, 236 [1988]); whether the accusatory instrument was valid (*see People v Harper*, 37 NY2d 96, 99 [1975]); whether the defendant was served with a subpoena (*see Matter of Kaplan*, 8 NY2d at 220); whether the appealing party filed its notice of appeal within the right number of days (*see Cappiello v Cappiello*, 66 NY2d 107, 108 [1985]); whether the administrative agency's decision was based on a law it could enforce (*see Montella v Bratton*, 93 NY2d 424, 432 [1999]); whether the trial court's order was appealable (*see People v McDonald*, 68 NY2d 1, 14 [1986]); and whether the record in the case was "a mechanical recording" or instead was "taken by a court stenographer" (*see People v Smith*, 27 NY3d 643, 649 [2016]). Questions of subject-matter jurisdiction, then, often turn on the facts of a particular case.

Thankfully, our precedent explains that "jurisdictional" often has not truly meant "jurisdictional," a proposition that cabins the precedential impact of the majority's opinion. In *Lacks v Lacks*, we dismissed "a line of decisions dating back to the last century and continuing into the present" on the ground that we spoke with "less than perfect meticulousness" when we used the phrase "jurisdiction" (41 NY2d at 74). We explained

that "[a] statement that a court lacks 'jurisdiction' to decide a case may, in reality, mean that elements of a cause of action are absent," and that "questions of mootness and standing of parties may be characterized as raising questions of subject matter jurisdiction," but are nonetheless not the "kinds of judicial infirmities" that would constitute a "lack of true subject matter jurisdiction or competence" (*id*. at 74-75; *see also Reed Elsevier, Inc.*, 559 US at 161 ["such 'drive-by jurisdictional rulings. . .' too easily can miss the 'critical difference(s)' between true jurisdictional conditions and nonjurisdictional limitations on causes of action" (alteration in original)]).  If preservation deprived our court of jurisdiction in the same way lack of personal jurisdiction or subject-matter jurisdiction did, a ruling on the basis of an unpreserved argument would constitute grounds for a motion to vacate the judgment (*see Lacks*, 41 NY2d at 76; *Royal Zenith Corp. v Continental Ins. Co.*, 63 NY2d 975, 977 [1984] ["A court is without power to render a judgment against a party as to whom there is no jurisdiction . . . and a judgment rendered without jurisdiction is subject to collateral attack"]).  Unless the majority has announced a sweeping new procedural mechanism for collaterally attacking our own judgments, it follows our tradition of speaking with "less than perfect meticulousness" (*see Lacks*, 41 NY2d at 74).  Indeed, the very phrase "subject-matter-jurisdiction exception" (majority op at 12) would be incoherent if we truly lacked subject-matter jurisdiction over unpreserved claims.

B.

Ms. Henry's waiver arguments fall into a second exception to our preservation requirement as well.  Contentions which could not "have been obviated or cured by factual

showings or legal countersteps . . . . below may be raised on appeal for the first time" (*Telaro v Telaro*, 25 NY2d 433, 439 [1969]; *accord Bingham v New York City Transit Authority*, 99 NY2d 355, 359 [2003]). NJT could not, when it first asserted its defense in 2020, have made any countermoves that would change the status of its waiver. It could not have traveled back to May 2019 and alerted Supreme Court that *Hyatt III* had changed the doctrinal landscape. Nor could it have gone further back and either not decided to do business in New York or repealed New Jersey's waiver of sovereign immunity. Indeed, if anyone was denied countermoves, it was Ms. Henry, who was denied the ability to access relevant discovery concerning what, if any, concessions NJT made in order to be able to operate in New York.[2]

In this case, the majority's preservation ruling did not prejudice Ms. Henry because the Appellate Division correctly ruled that NJT had waived any sovereign immunity it might have been able to claim. Had it gone the other way, however, the majority's application of the preservation doctrine would have served to blindside Ms. Henry and deny her the ability to litigate this issue fully. Such a decision would defy common sense and the fair expectations of litigants.

---

[2] Ms. Henry observes that, because NJT first raised sovereign immunity on appeal, she had no opportunity to discover whether any agreements between New York and New Jersey already exist by which New Jersey has contractually waived its sovereign immunity in connection with the operation of NJT in New York.

II.

The scope of immunity asserted by NJT exceeds the scope of historical practice.  In an effort to make an anachronistic "meaning move across time," lawyers sometimes ignore the important context and nuance that has characterized the historical practice of suits against sovereigns (*cf.* Lauren Benton, *Beyond Anachronism: Histories of International Law and Global Legal Politics*, 21 J of the Hist of Int'l L 7, 10 [2019] [internal quotation marks omitted]).  The historical practice of private litigation against sovereign entities suggests that the rhetoric often used to justify an expansive reading of sovereign immunity is misleading at best.

The U.S. Supreme Court has identified two historical strands that are braided together to form our contemporary doctrine of sovereign immunity: "common law sovereign immunity" and "law-of-nations sovereign immunity" (*Hyatt III*, 139 S Ct at 1493).  Both doctrines, as practiced at the time that the Federal Constitution was ratified, permitted sovereign tribunals to vindicate the rights of private parties who had been harmed by a government.  One important basis for jurisdiction has long been a sovereign's implied consent to being sued, especially when a sovereign commits wrongs in another sovereign's territory.

"Common law sovereign immunity" provided subjects with wide latitude to sue their own government officials and even the king himself.  When William Blackstone wrote that "no suit or action can be brought against the king, even in civil matters, because no court can have jurisdiction over him," he qualified his statement by noting that the king

could nonetheless be subject to process by his consent or "grace" (1 Blackstone, at 235-236). Blackstone's statement did not, however, mean that the king and his officials were generally insulated from liability. To the contrary, the immunity of the king did not extend to his officers (*see* Louis L. Jaffe, *Suits Against Governments and Officers: Sovereign Immunity*, 77 Harv L Rev 1, 3 [1963]; James E. Pfander, *Sovereign Immunity and the Right to Petition: Toward a First Amendment Right to Pursue Judicial Claims Against the Government*, 91 Nw U L Rev 899, 920-921 [1997]). Moreover, sovereign immunity did not shield the king himself from the law either. By Blackstone's time "the requirement of consent to suit had gradually disappeared," as either the requirement was replaced by a "fictional consent" or else "the authority to pass upon the petition was shifted from the Crown to the courts of justice" (Pfander, at 911-912 [1997]).

At the time of this nation's founding, "law-of-nations sovereign immunity" recognized significant limits on a sovereign's ability to escape another sovereign's tribunals for actions taken in that sovereign's territory. As the fêted Emer de Vattel, "the founding era's foremost expert on the law of nations" opined, " '[i]t does not ... belong to any foreign power to take cognisance of the administration of [another] sovereign, to set himself up for a judge of his conduct, and to oblige him to alter it . . . .' The sovereign is 'exemp[t] ... from all [foreign] jurisdiction' " (*Hyatt III*, 139 S Ct at 1493-1494, citing 2 Emer de Vattel, The Law of Nations § 55, at 155 [J. Chitty ed. 1883] and 4 *id*. § 108, at 486; *see also* John Fabian Witt, Lincoln's Code: The Laws of War in American History 16 [2012] [describing Vattel as "the most widely ready authority in Europe and its colonies

on . . . the law of nations"]). Though it might sound sweeping, Vattel's immunity mostly referred to efforts by one nation to take charge of the internal governance of another: when he explained that a foreign power could not take cognizance of the administration of another sovereign, his quintessential examples involved a foreign sovereign who supplanted a domestic sovereign for taxing his subjects too highly, inflicting unjust punishments on his subjects, or contravening Christian morals—"things, for which [the domestic sovereign] was not at all accountable to [the foreign sovereign]" (2 *id*. § 55, at 155-156; *accord* 1 James Kent, Commentaries on American Law 20-21 [Comstock ed. 1867]). By contrast, Vattel acknowledged a domestic sovereign's "right to preserve herself from all injury" because "when we cannot use constraint in order to cause our rights to be respected, their effects are very uncertain" (2 Vattel § 49, at 154; *accord* 1 Kent at 22 ["Every nation has an undoubted right to provide for its own safety, and to take due precaution against distant as well as impending danger"]).

Vattel further distinguished between types of conduct in his account of the immunity afforded to the literal body of a foreign sovereign itself. Thus, if a prince were in a foreign country to negotiate or "treat about some public affair" he would be "entitled in a more eminent degree to enjoy all the rights of ambassadors," whereas "[i]f he c[a]me as a traveler, his dignity alone, and the regard due [his] nation" would "exempt[] him from all jurisdiction," though the host country could withdraw that protection if it so informed him (4 Vattel § 108, at 486). However, if he "act[ed] as an enemy," the prince would be entitled to no regard at all (4 *id*. § 108, at 486). Moreover, the foreign prince could not exercise his

rights in such a manner as to "affect the sovereignty of the country in which he [was] a sojourner" (*id*. at 487; *see also* 2 *id*. § 92, at 169 ["the least encroachment on the territory of another is an act of injustice"]).

Vattel's conception of sovereign immunity left sovereigns with wide latitude to punish foreigners who committed transgressions within territorial boundaries and foreign sovereigns who failed to force their subjects to repair the harms inflicted. "Even in cases of ordinary transgressions, which are only subjects of civil prosecution . . . with a view to the recovery of damages . . . the subjects of two neighboring states [we]re reciprocally obliged to appear before the magistrate of the place where they [we]re accused of having failed in their duty" (2 *id*. § 76, at 162). The foreign subject's sovereign was generally not permitted "to examine whether the accusation be true or false" and if the sovereign "refuse[d] to cause reparation to be made for the damage done by his subject," the sovereign would "render[] himself in some measure an accomplice in the injury and become[] responsible for it" (2 *id*. § 76-77, at 163).

In Early American courts, the customary recognition of "law-of-nations sovereign immunity" was subject to a sovereign's capacity and duty to govern its own territory. Early American courts confronting the question of sovereign immunity held that any immunity was subject to the consent of the host nation, as "[t]he jurisdiction of the nation within its own territory is necessarily exclusive and absolute. It is susceptible of no limitation not imposed by itself" (*The Schooner Exchange v McFaddon*, 7 Cranch [11 US] 116, 136 [1812] [Marshall, Ch. J.]; *accord The Santissima Trinidad*, 7 Wheat [20 US] 283, 353

[1822] [Story, J.] ["(C)onsent and license is implied only from the general usage of nations, it may be withdrawn upon notice at any time, without just offence, and if afterwards such public ships come into our ports, they are amenable to our laws in the same manner as other vessels"]).  In addition to recognizing a nation's general capacity to withdraw its consent, Chief Justice Marshall also noted that sovereign immunity was *never* assumed to extend to certain types of cases.  In a leading case on the subject, Chief Justice Marshall recognized "cases of implied assent" to foreign jurisdiction, including cases in which the sovereign "acquire[d] property in the country, whether real or personal" or "[i]n case of offences against existing laws, such as . . . breaking the peace when in port," though this implication did not extend "where the sovereignty is concerned," as in cases of "an ambassador" or the "sovereign himself" (*The Schooner Exchange* 7 Cranch [11 US] at 125).

Of course, the historical practice of what we in retrospect call "sovereign immunity" between nation states does not fully account for the unique structure of the Federal Constitution, though it illustrates the background expectations the framers would have had when they designed the constitutional order (*see Hyatt III*, 139 S Ct at 1497 ["the Constitution affirmatively altered the relationships between the States, so that they no longer relate to each other solely as foreign sovereigns"]).  In Federalist No. 81, Alexander Hamilton commented on the fact that a sovereign could not be sued in a court without its consent (*see* majority op at 7, quoting Federalist No. 81) and in the Debates of the Virginia Convention, James Madison asserted that "[i]t is not in the power of individuals to call any state into court" (Virginia Debate, June 20, 1788, reprinted in 3 The Debates in the Several

State Conventions of the Adoption of the Federal Constitution 531, 533 [J. Elliot ed., 1866]). There is no indication, however, that either Hamilton or Madison meant to sweep aside well-established doctrines of implied consent. Hamilton's statement responded to concerns that citizens of foreign states would attempt to enforce a state's debt contracts in federal court (*see* Hamilton, Federalist No. 81), an option that would not have been available to international creditors under the law of nations, for whom debts with a sovereign were tantamount to treaties, which bound only the conscience of the nation and would not have been enforceable in a court (*see* Vattel, Preliminaries, § 21, at lxiii-lxiv; 2 Vattel, § 214, at 226-227; Jennifer Pitts, Boundaries of the International: Law and Empire 70 [2018]; *see also* John J. Gibbons, *The Eleventh Amendment and State Sovereign Immunity: A Reinterpretation*, 83 Colum L Rev 1889, 1910-1912 [noting that Hamilton's remark did not suggest a sweeping sovereign immunity]).[3] Madison similarly made sure to qualify that "if a state should condescend to be a party, this court may take cognizance of it" (Madison, at 533; *see also* Gibbons at 1906 [noting that Madison's statement "[i]n context . . . becomes more ambiguous"]). Indeed, an expansive reading of either remark would make little sense with article III, section 2, clause 1 of the Federal Constitution,

---

[3] *Chisholm v Georgia* (2 Dall [2 US] 419 [1793]) involved exactly the type of case that Hamilton warned against, and which would not have been cognizable under prevailing understandings of sovereign immunity—a foreign-state creditor's attempt to use federal court to enforce a debt contract against the state of Georgia. Americans promptly rebuked the Federal Supreme Court with the Eleventh Amendment, an amendment designed to limit the jurisdiction of federal courts in cases like these (*see generally* Stephen E. Sachs & William Baude, *The Misunderstood Eleventh Amendment*, 169 U Pa L Rev 609, 626 [2021]). However, the Eleventh Amendment—which explicitly only reaches diversity cases in federal courts—did not sweep so broadly as to preclude all suits.

which clearly envisions *some* justiciable "Controversies . . . between a State and Citizens of another state."

Early American practice confirms the limits on sovereign immunity when government officials from foreign states or countries inflicted harm within a state's territory. Americans generally expected to be able to use common law suits to hold government officials directly accountable for their misconduct; the government officials could then petition their respective legislatures for private bills indemnifying them for the judgment, thus obviating the need to sue states directly (*see generally* Jerry L. Mashaw, Reasoned Administration and Democratic Legitimacy 17 [2018]; James E. Pfander and Jonathan L. Hunt, *Public Wrongs and Private Bills: Indemnification and Government Accountability in the Early Republic*, 85 NYU L Rev 1862, 1871-1876 [2010]; *A True Federalist*, Independent Chronicle, Mar 2 and 6, 1797, reprinted in Maeva Marcus ed., 5 The Documentary History of the Supreme Court, 1789-1800, at 629, 630 [1994]). That expectation often extended to the agents and instrumentalities of foreign states, as Americans could often sue in their home state court if those officers or instrumentalities committed wrongs in the home state, owned property in the home state, engaged in commercial activity, or consented to suit in some other way (*see* Ann Woolhandler, *Interstate Sovereign Immunity*, 2006 S Ct Rev 249, 276-277 [2006]).

Subsequent efforts to expand the scope of American sovereign immunity have largely left open the broad scope of the historical consent doctrine. In *Hans v Louisiana*, the Supreme Court explained that the Constitution should not be understood to permit

"*anomalous and unheard-of* proceedings or suits" in federal court, and that "state courts have no power to entertain suits by individuals against a state *without its consent*" (134 US 1, 18 [1890] [emphasis added]).  The spate of twentieth-century cases addressing sovereign immunity typically concerned the Eleventh Amendment and federal jurisdiction, not interstate sovereign immunity.  As the United States Supreme Court noted in *Nevada v Hall*, its prior case law did not "answer the question whether the Constitution places any limit on the exercise of one's State's power to authorize its courts to assert jurisdiction over another State" (440 US 410, 421 [1979]).  The *Hall* court answered that the Federal Constitution created no such limit, and that states extended immunities to one another as a matter "of state policy, rather than a constitutional command" (*id*. at 425).  It was not until *Hyatt III* that the Supreme Court articulated a constitutional basis for a foreign state's ability to assert sovereign immunity in another state's court.

Even under this new regime, however, the U.S. Supreme Court has been careful to qualify that "the Constitution bars suits [only] against *nonconsenting* States" (*Hyatt III*, 139 S Ct at 1496 [emphasis added]).  In the analogous Eleventh Amendment context, the Supreme Court has found that the "[t]he States have consented . . . to some suits pursuant to the plan of the Convention or to subsequent constitutional Amendments" (*Alden v Maine*, 527 US 706, 755 [1999]).  At this point, the list of implied consent includes bankruptcy proceedings (*Central Va. Community College v Katz,* 546 US 356, 379 [2006]); eminent domain proceedings (*PennEast Pipeline Co., LLC v New Jersey*, 141 S Ct 2244, 2263 [2021]); the federal policy to build and keep a national military (*Torres v Texas*

*Department of Public Safety*, 142 S Ct 2455, 2460 [2022]); the enforcement power of the

Fourteenth Amendment (*see Fitzpatrick v Bitzer*, 427 US 445, 456 [1976] [justifying the

Fourteenth Amendment as an exception to sovereign immunity]); suits by other States

(*South Dakota v North Carolina*, 192 US 286, 318 [1904]); and suits by the Federal

Government (*United States v Texas*, 143 US 621, 646 [1892]).

## III.

Admittedly, the *Hyatt III* regime is still somewhat *terra incognita*. However, the

new sovereign immunity can still be waived. The touchstone principle is that "[e]ach

State's equal dignity and sovereignty under the Constitution implies . . . . the inability of

one State to hale another into its courts without the latter's consent" (*Hyatt III*, 139 S Ct at

1497; *see also PennEast Pipeline Co., LLC v New Jersey*, 141 S Ct 2244, 2264 [2021]

[Gorsuch, J., concurring]). If NJT submits to the jurisdiction of New York courts, then, it

loses the ability to claim that its sovereignty has been violated—assuming, *arguendo*, that

NJT (as opposed to the State of New Jersey itself) has any right to assert sovereign

immunity in the first place.

Because NJT's sovereign immunity claim falls into our jurisdictional exception, I

must address the merits of its argument. To the extent that NJT might be entitled to a

sovereign immunity defense, it and the state of New Jersey consented to New York

jurisdiction in three ways. Because those three ways are independent and none has a logical

or legal priority over the others, I discuss each below. First, NJT waived sovereign

immunity by its litigation conduct: NJT did not assert a sovereign immunity defense at the

first opportunity after *Hyatt III*, waiting instead until it perfected its appeal to make this argument. Second, NJT waived any claim of sovereign immunity it might have had by operating a multimillion-dollar business within the State of New York. Third, the state of New Jersey waived any sort of sovereign immunity defense on NJT's behalf by subjecting it to liability in New Jersey.

## A.

*Hyatt III* suggests that a state can waive its sovereign immunity by its litigation conduct (*see* 139 S Ct at 1491 n 1). The U.S. Supreme Court is clear that waiver by litigation conduct can express a state's consent to jurisdiction (*cf. Atascadero State Hosp. v Scanlon*, 473 US 234, 238 [1985] ["if a State waives its immunity and consents to suit in federal court, the Eleventh Amendment does not bar the action"]). Because interstate immunity is rooted in the indignity of "compulsory judicial process" (*id.* at 1498), a "State's voluntary appearance in [another State's] court amounts to a waiver of its [sovereign] immunity," as it does in the Eleventh Amendment context (*cf. Lapides v Board of Regents of Univ. System of Ga.*, 535 US 613, 619 [2002] [describing the Eleventh Amendment context]; *Petty v Tennessee-Missouri Bridge Comm'n*, 359 US 275, 276 [1959] [same]; *Gunter v Atlantic Coast Line R. Co.*, 200 US 273, 284 [1906]; *Clark v Barnard*, 108 US 436, 447 [1883] [same]).

Whatever the exact contours of the litigation-conduct waiver doctrine in the Eleventh Amendment context, a state may not assert the interstate sovereign immunity defense after it has allowed a case to proceed to judgment in another state's tribunal, as

NJT has here.  Permitting states to assert sovereign immunity after another court has tried and decided a case would let states abuse the Full Faith and Credit Clause, subverting the logic of federalism and needlessly stripping jurisdiction from the litigating state's court. The "animating purpose of the full faith and credit command" is to make the states " 'integral parts of a single nation throughout which a remedy upon a just obligation might be demanded as of right, irrespective of the state of its origin,' " instead of " 'independent foreign sovereignties, each free to ignore obligations created under . . . the judicial proceedings of the others' " (*Baker by Thomas v General Motor Corp*, 522 US 222, 232 [1998], quoting *Milwaukee County v M.E. White Co.*, 296 US 268, 277 [1935]).  To that end, the Full Faith and Credit Clause ensures that a State "may not disregard the judgment of a sister State because it disagrees with the reasoning underlying the judgment or deems it to be wrong on the merits" (*V.L. v E.L.*, 577 US 404, 407 [2016]).

Allowing a state that has voluntarily litigated a case to the merits to subsequently assert sovereign immunity would let a state use the Full Faith and Credit clause to seek multiple trials and pit the tribunals of one state against another.  A state may not obtain a judgment in a foreign tribunal and then—if dissatisfied with the result—claim that it was never bound by the foreign tribunal's decision in the first place.  Although this type of judgment shopping is possibly unavoidable in federal court because of the jurisdiction-stripping wording of the Eleventh Amendment (*see Schacht*, 524 US at 394 [Kennedy, J., concurring]), it defies the structural logic of interstate sovereign immunity: permitting that type of judgment shopping would encourage States to avoid their own courts by litigating

first in foreign tribunals with the preclusive effect of the Full Faith and Credit Clause and then—if unsuccessful—to assert sovereign immunity as a "get-out-of-judgment-free" card. Indeed, in this case, if NJT were victorious in asserting its sovereign immunity defense, Ms. Henry would be barred by New Jersey's statute of limitations from bringing her suit in New Jersey (*see* NJ Stat Ann § 59:8-8). When NJT decided to litigate this case in New York for five years, it surrendered the right to claim that the forum was inappropriate.

NJT argues that its decision to litigate this case through to a jury verdict is irrelevant because *Hyatt III* had not been decided until after Supreme Court issued its initial judgment. However, NJT did not assert its sovereign immunity defense in a timely manner. *Hyatt III* was decided on May 13, 2019. At the time, this matter was still pending in the trial court, which denied NJT's motion to set aside the jury verdict on June 27, 2019. NJT made no effort to apprise the trial court of *Hyatt III* or assert a new defense based on it. NJT did not include any mention of *Hyatt III* or sovereign immunity in its notice of appeal on September 4, 2019. Not until it perfected its appeal on October 5, 2020 did NJT argue for the first time that sovereign immunity precluded Supreme Court from rendering a verdict. Its dilatory conduct constitutes a waiver.

## B.

The logic of *Hyatt III* supports Ms. Henry's claim that NJT waived any sovereign immunity it might have had by choosing to conduct an ongoing business in the State of New York. Recognizing NJT's consent to being sued in New York reflects the asymmetric nature of the sovereign interests in this case: New Jersey suffers little indignity when its

commercial transit business creates injuries within New York's borders and is brought before New York courts to answer for those injuries.  New Jersey's consent to jurisdiction reflects its respect for New York's important sovereign interests in governing the safety of its territory and protecting persons within its borders.

New Jersey is "no longer [a] fully independent nation[]" and lacks the political power to avoid the legal resolution of New Yorkers' grievances against it (*see Hyatt III*, 139 S Ct at 1497; *cf. Torres v Texas Department of Public Safety*, 142 S Ct 2455, 2462 [2022] ["States may be sued if they agreed their sovereignty would yield as part of the plan of the Convention . . . that is, if the structure of the original Constitution itself reflects a waiver of States' sovereign immunity" (internal quotations omitted)]).  The Constitution has stripped states of traditional remedies available to independent nation-states if foreign sovereigns failed to redress injuries within their borders, including the ability to engage in diplomacy, refuse sovereign immunity to the foreign sovereign, levy war (*see Hyatt III*, 139 S Ct at 1497-1498), or bar foreign sovereigns from entering their territory (*cf. C & A Carbone, Inc. v Town of Clarkstown, N.Y.*, 511 US 383, 390 [1994]; 2 Vattel § 94, at 169-170 ["The sovereign may forbid the entrance of his territory either to foreigners in general or in particular cases, or to certain persons or for certain particular purposes, according as he may think it advantageous to the state . . . everyone is obliged to pay respect to the prohibition"]).  In part to compensate for this loss of sovereignty, the Constitution imposed duties on states that they did not have before, and has turned some subjects that once were "decided by pure 'political power' before ratification" into ones that "now turn on . . . 'rules

of law' " (*id*. at 1498, quoting *Rhode Island v Massachusetts*, 12 Pet [37 US] 657, 737 [1838]).  Indeed, a dispute that would be a "*casus belli*" between fully sovereign states is the quintessential example of when the United States Supreme Court may exercise its original jurisdiction, furnishing a tribunal worthy of such an important dispute (*see State of Nebraska v State of Wyoming*, 515 US 1, 8 [1995], quoting *Mississippi v Louisiana*, 506 US 73, 77 [1992]).  Whereas in the past a sovereign's wrong might result in expulsion, retaliation, or even war, today the wrong results in legal process.  Under *Hall*, the forum state's tribunal would determine which state had jurisdiction; after *Hyatt III*, "federalism" guides our analysis instead (*Hyatt III*, 139 S Ct at 1498, quoting *Hall*, 440 US at 430 [Blackmun, J., dissenting]).

Federal jurisprudence surrounding personal jurisdiction—which involves issues that "align closely with [the] treatment of" the concepts central to sovereign immunity (*see* majority op at 12)—underscores the way jurisdiction in a federalist system is sensitive to the parties' underlying interests and the particular context of a given dispute.  In personal jurisdiction cases, principles of " 'interstate federalism' support jurisdiction" when the forum states have "significant interests at stake—'providing [their] residents with a convenient forum for redressing injuries inflicted by out-of-state actors,' as well as enforcing their own safety regulations" (*Ford Motor Company v Montana Eighth Judicial District Court*, 141 S Ct 1017, 1030 [2021], quoting *Burger King Corp. v Rudzewicz*, 471 US 462, 473 [1985]).  Indeed, "if another State were to assert jurisdiction in an inappropriate case, it would upset the federal balance, which posits that each State has a

sovereignty that is not subject to unlawful intrusion by other States" (*J. McIntyre Machinery, Ltd. v Nicastro*, 564 US 873, 884 [2011] [plurality op]). However, these considerations must be weighed against "the Due Process Clause" right of the defendant, which "act[s] as an instrument of interstate federalism" in addition to individual liberty and can "divest the State of its power to render a valid judgment" (*Bristol-Meyers Squibb Co.*, 137 S Ct at 1776, citing *World-Wide Volkswagen Corp. v Woodson*, 444 US 286, 294 [1980]). The "primary focus" of the Due Process inquiry "is the defendant's relationship to the forum State" (*Bristol-Meyers Squibb Co.*, 137 S Ct at 1779). If a defendant is "essentially at home" in a State or "purposefully avails itself of the privilege of conducting activities within the forum State . . . by, for example, exploiting a market in the forum State" the federalism-enforcing Due Process Clause yields to the state interest in asserting jurisdiction over activities within its own boundaries (*Ford Motor Company*, 141 S Ct at 1024 [internal quotation marks omitted]).

In other words, well-established principles of jurisdiction in a federalist context establish that New York's sovereign interests are relevant in determining when it has jurisdiction and the nature of NJT's contacts and presence in the state of New York helps determine the extent to which it acquiesces to New York jurisdiction. In this case, New York has a strong interest in protecting the integrity of its territory, the safety of its roads and subjects, and its commercial prosperity whereas New Jersey has extensive, voluntary, and lucrative contacts within the State of New York such that we may conclude that it has

consented to jurisdiction in New York. The principles of federalism that underpin both personal jurisdiction and interstate sovereign immunity jurisprudence require nothing less.

A state's ability to assert jurisdiction is heightened when it is governing its own territory. Although the framers of the Federal Constitution envisioned an integrated nation, they "also intended that the [s]tates retain many essential attributes of sovereignty, including, in particular, the sovereign power to try causes in their courts" (*World-Wide Volkswagen*, 444 US at 293; *accord Bristol-Myers Squibb Co.*, 137 S Ct at 1780-1781). State boundaries have long played an important role in determining the jurisdiction of these courts (*see World-Wide Volkswagen Corp.*, 444 US at 293 ["we have never accepted the proposition that state lines are irrelevant for jurisdictional purposes, nor could we, and remain faithful to the principles of interstate federalism embodied in the Constitution"]). The jurisdictional importance of state boundaries is why "no State can apply its own law to interstate disputes over borders" (*Hyatt III*, 139 S Ct at 1498, citing *Cissna v Tennessee*, 246 US 289, 295 [1918]; *see also Texas Industries, Inc. v Radcliff Materials, Inc.*, 451 US 630, 641 [1981]). New York and New Jersey are no strangers to this principle (*see New Jersey v New York*, 523 US 767 [1998]; *State of New Jersey v People of State of New York*, 5 Pet [30 US] 284 [1831]).

New York's interest in protecting the safety of its roads is strong, and NJT's continued use of them is a basis from which we may infer consent. "Motor vehicles are dangerous machines, and, even when skillfully and carefully operated, their use is attended by serious dangers to persons and property" (*Hess v Pawloski*, 274 US 352, 356 [1927]; *cf.*

*South Dakota v Neville*, 459 US 553, 558-559 [1983]). To protect against these dangers, states may provide rules of the road that apply to "residents and nonresidents alike" (*Hess*, 274 US at 356). States may assume that nonresidents who use the roads consent to a system that will require them "to answer for [their] conduct in the state where arise causes of action alleged against [them], as well as to provide for . . . claimant[s] a convenient method by which [they] may sue to enforce [their] rights" (*id*.).

Furthermore, when a State operates a vast business within the boundaries of another state—as NJT does—it weakens any claim it might have to special treatment (*see Bank of U.S. v Planters' Bank of Georgia*, 22 US 904, 907 [1824] ["It is, we think, a sound principle, that when a government becomes a partner in any trading company, it devests itself, so far as concerns the transactions of that company, of its sovereign character, and takes that of a private citizen"]; *Bank of Com. of Kentucky v Wister*, 27 US 318, 323 [1829] [extending this principle to a fully government-owned bank]; *Louisville, C. & C.R. Co. v Letson*, 2 How [43 US] 497, 550-551 [1844] [extending *Planters' Bank* to state ownership share in railroad]; *State of Ga. v City of Chattanooga*, 264 US 472, 482-483 [1924] ["the acceptance by Georgia of the permission given it to acquire the railroad land in Tennessee is inconsistent with an assertion of its own sovereign privileges in respect of that land . . . and amounts to a consent that it may be condemned as may like property of others"]; *see generally*, Woolhandler, at 278-280 [discussing the "commercial/consent exception" to sovereign immunity, and explaining that "(p)erhaps the largest group of cases holding a state could be made a less-than-voluntary party were those arising from Georgia's

ownership, with the approval of the Tennessee legislature, of a railroad in Tennessee"]).

As we noted in *Ehrlich-Bober & Co. v University of Houston*, New York has a "recognized

interest in maintaining and fostering its undisputed status as the preeminent commercial . .

. nerve center of the Nation and the world . . . . That interest naturally embraces a very

strong policy of assuring ready access to a forum for redress of injuries arising out of

transactions spawned here" (49 NY2d 574, 581 [1980]).  The "interest in providing a

convenient forum is least subject to challenge when a transaction is centered here . . . and

particularly when it is wholly commercial in character . . . . [A] State entering this

jurisdiction specifically to take advantage of its unique commercial resources may be

considered to have given up any claim of jurisdictional immunity by virtue of governmental

capacity" (*id*.; *see also Duetsche Bank Sec., Inc. v Montana Bd. of Invs.*, 7 NY3d 65, 72-

73 [2006]).  Although *Hyatt III* may have changed the calculus and source of sovereign

immunity, it did not change New York's sovereign interests.

In this case, then, New York's sovereign interests are at their zenith while NJT's are

at their nadir.  Having operated a lucrative business for decades, NJT has availed itself of

New York's roads, regulations, and customer base without exercising the type of sovereign

authority that commands heightened constitutional respect.  NJT has benefitted from the

orderly operation of New York's court system and largely complied with its rules of the

road.  In *Hyatt III*, the Franchise Tax Board of California entered Nevada briefly to enforce

its own tax laws against one of its former citizens, in furtherance of which it committed

torts against that former citizen within Nevada (*see* 139 S Ct at 1490-1491).  California's

"sovereign right to tax income" was a particularly important interest and its run-in with Nevada's sovereignty was relatively minimal and incidental to its attempts to vindicate its plenary right to tax its residents (*cf. Oklahoma Tax Commn v Chickasaw Nation*, 515 US 450, 466 [1995]). Here, by contrast, NJT has set up shop in New York, benefitted greatly from the use of our roads, access to our economy and the protection provided by our court system; it is being sued in New York for a tort committed in New York as to which New York's interests dwarf those of New Jersey. NJT may not now claim that submitting to this same court system is an affront to its dignity.

## C.

Notwithstanding the fact that NJT has waived any sovereign immunity it has via its litigation conduct and continuous and extensive operations in New York, the State of New Jersey has also statutorily waived any type of sovereign immunity NJT might have. States may pass statutes explicitly consenting to be sued (*cf. Sossaman v Texas*, 563 US 277, 284 [2011] [discussing Eleventh Amendment sovereign immunity]). The operation of our own Court of Claims depends upon that principle (*see* Court of Claims Act § 8). In the Eleventh Amendment Context, a "State's consent to suit in its own courts is not a waiver of its immunity from suit in *federal* court" (*Sossaman*, 563 US at 285 [emphasis added]). However, the "fundamental principle of equal sovereignty among the States" precludes New Jersey from making a similarly limited waiver with respect to the courts of other *states* (*Hyatt III*, 139 S Ct at 1497, quoting *Shelby County v Holder*, 570 US 529, 544 [2013] [emphasis omitted]).

The United States Supreme Court has long held that a state may not refuse to apply the laws of another state when doing so reflects a "policy of hostility to the public Acts" of another state (*Carroll v Lanza*, 349 US 408, 413 [1955]).  When New Jersey claimed that it could not exercise jurisdiction over claims sounding in New York law despite exercising jurisdiction over comparable claims based in New Jersey law, the United States Supreme Court intervened (*see Broderick v Rosner*, 294 US 629, 642-644 [1935]; *see also Hughes v Fetter*, 341 US 609, 611 [1951]).  In *Hyatt II*, the Court applied that doctrine to immunities, holding that Nevada had to grant California the same immunity it provided to its own agencies—it could not apply "a special rule of law that evinces a 'policy of hostility' toward California" (*Franchise Tax Bd. of California v Hyatt*, 578 US 171, 176 [2016] [hereinafter *Hyatt II*], quoting *Franchise Tax Bd. of California v Hyatt*, 538 US 488, 499 [2003]).

Here, New York and New Jersey have both waived sovereign immunity for quasi-state commercial carriers, including NJT (*see, e.g.* NJ Stat Ann § 59:2-2; Public Authorities Law § 1212; 1276).  New Jersey's legislature and high court require that NJT be held liable to the same extent as a comparably positioned private party (*see* NJ Stat Ann § 59:2-2; 59:3-1; *Maison v New Jersey Transit Corp.*, 245 NJ 270, 289-291 [2021]).  Indeed, under New Jersey law, NJT is held to a "heightened common carrier" standard of negligence— as New Jersey's high court noted, "the duty to provide safe travel to passengers on NJ Transit buses is no less urgent than the duty imposed on privately owned bus operators" (*Maison*, 254 NJ at 291-292).  Nevertheless, NJT asks us to dismiss this case on the grounds

that "New York courts permit the dismissal of actions against the State of New York on sovereign immunity grounds."

NJT would require us to apply a special rule exempting it from liability. Its rule would provide NJT treatment not only more favorable than New York applies to its own transit authorities but also more favorable than NJT would receive in its own home-state court. Indeed, under New Jersey's venue requirements, it is not clear that Ms. Henry would be entitled to sue NJT by right anywhere, even in the state of New Jersey (*see Colt v New Jersey Tr. Corp.*, 206 AD3d 126, 128 [1st Dept 2022] [interpreting NJ Rules of Ct rule 4:3-2 (a)]; *but see* NJ Rules of Ct Rule 1:1-2 [a] ["Unless otherwise stated, any rule may be . . . dispensed with by the court in which the action is pending if adherence to it would result in an injustice"]).

NJT's insistence that it may be haled in front of New Jersey courts but not New York courts is not based on any coherent rationale and is in fact somewhat ironic given that Ms. Henry, a New Jersey resident, is exactly the type of person New Jersey was trying to protect by waiving NJT's sovereign immunity. NJT proposes a "policy of hostility to the public Acts" of New York (*Hyatt III*, 139 S Ct at 1497, quoting *Hyatt II*, 578 US 176). NJT defends its "special and discriminatory rule" with "little more than a conclusory statement [implicitly] disparaging [New York's] own . . . judicial" system (*Hyatt II*, 578 US at 178). "A constitutional rule that would permit this kind of discriminatory hostility is likely to cause chaotic interference by some States into the internal . . . affairs of others" (*id*. at 178-179) by punishing NJT for accidents in Trenton but authorizing it to wreak

havoc on the streets of Philadelphia or New York City or forcing persons injured in those other states—even those residing there and never touching New Jersey soil—to press their claims in New Jersey.

IV.

Instead of offering guidance to lower courts about how to confront that problem, we have rewritten federal rules of waiver and jurisdiction as well as our own preservation doctrine to dodge the question. However, the issue is too common and the law too unsettled for us to evade it for long. Every NJT bus and train has the potential to inflict injuries when it enters New York. The persistent legal uncertainty surrounding NJT risks leaving those injured by NJT within NY's borders without protection and legislators and regulators without guidance.

We are not, however, the only body that can provide a solution. New York could negotiate a compact with New Jersey to make NJT unambiguously subject to the jurisdiction of New York courts. Even more expediently, the New Jersey legislature could statutorily prevent NJT from asserting sovereign immunity in New York courts, much as it prevented NJT form doing so in response to certain federal claims (*see Robinson v New Jersey Tr. Rail Operations, Inc.*, 776 Fed Appx 99, 100 [3d Cir 2019]). As this case demonstrates, in taking care of New Yorkers, New Jersey would take care of its own.

Appeal dismissed, without costs, upon the ground that no substantial constitutional question is directly involved. Opinion by Judge Singas. Acting Chief Judge Cannataro and Judges Rivera and Garcia concur. Judge Wilson dissents in an opinion, in which Judge Troutman concurs.

Decided March 21, 2023